Jeffrey N. Pomerantz (CA Bar No. 143717)
Debra I. Grassgreen (CA Bar No. 169978)
John W. Lucas (CA Bar No. 271038)
Malhar S. Pagay (CA Bar No. 189289)
PACHULSKI STANG ZIEHL & JONES LLP
150 California Street, 15th Floor
San Francisco, California 94111-4500
Telephone: 415.263.7000
Facsimile: 415.263.7010
Email: jpomerantz@pszjlaw.com
       dgrassgreen@pszjlaw.com
       jlucas@pszjlaw.com
       mpagay@pszjlaw.com

Proposed Attorneys for Debtors

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| In re: | Case No.:16- 30296-DM |
| BLUE EARTH, INC., et al.,[1] | Chapter 11 |
| Debtors. | Joint Administration Requested |
| | **DECLARATION OF G. ROBERT POWELL IN SUPPORT OF FIRST DAY MOTIONS** |

I, G. Robert Powell, hereby declare as follows:

1.       I am the Chief Executive Officer and Director of Blue Earth, Inc. ("**BEI**"), and the President and sole Director of Blue Earth Tech, Inc. ("**BETI**" and together with BEI the "**Debtors**"). The Debtors, together with their subsidiaries and affiliates are referred to herein as "Blue Earth."  I have over 25 years of experience in the energy sector globally.  Prior to joining Blue Earth, I was with SunEdison, Inc., the world's largest renewable energy development company, from July 2013 until March 2015, when I left to cofound Correlate, Inc.  During my tenure at SunEdison, I served as President of North America and President of Asia Capital Markets.  Previously, from November 2011 to May 2013, I was Senior Vice President and Chief Financial Officer of NRG Renew (formerly NRG Solar) and, from 2009 to November 2011 served as President and CEO of Solar

---

[1]  The last four digits of each of the Debtors' tax identification numbers are Blue Earth, Inc. (1496) and Blue Earth Tech, Inc. (0269).  The location of the Debtors' headquarters and service address is 235 Pine Street, Suite 1100, San Francisco, California 94104.

DOCS_LA:297427.6 09999/001

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

Power Partners ("**SPP**"). Prior to joining SPP, from September 2005 to February 2008, I was employed by Pacific Gas & Electric Company (the public operating subsidiary of PG&E Corporation, a Fortune 200 company providing gas and electric service to over five million customers in California), last serving as Chief Financial Officer.

2. I received a Bachelor of Science degree in Electrical Engineering (with honors) in 1988 from Georgia Institute of Technology and a Masters of Business Administration degree in Finance in 1990 from Georgia Institute of Technology. From 1990 to 2002, I was employed, last as a partner, by Arthur Andersen LLP, then the largest of the Big 5 accounting firms. From 2002 to 2005, I was a partner in PricewaterhouseCoopers LLC's national energy practice.

3. I am knowledgeable about, and familiar with, the business and financial affairs of Blue Earth and the energy industry and am authorized to submit this declaration on behalf of the Debtors. If called upon to testify, I can competently testify to the facts set forth in this Declaration.

4. This Declaration is divided into two parts: The first part contains general background information regarding the Debtors' business operations and financial condition; the second part contains information relevant to the various motions for relief filed on or about the Petition Date (collectively, the "**First Day Motions**").

## II.

## PART I

**A.** **Introduction**

5. Blue Earth, Inc. (the "**Debtor**" or "**BEI**"), and its subsidiaries, is a comprehensive provider of alternative/renewable energy solutions for small and medium-sized commercial and industrial facilities. The Debtor builds, manages, owns and operates independent power generation and management systems geared towards helping commercial and industrial building owners save energy and money, and reduce their carbon footprint.

6. The Debtor's professionals map out building energy needs and offer turnkey solutions and custom designed services that include the development, engineering, construction, operation, maintenance, and financing of small and medium-scale alternative/renewable energy power plants.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

Blue Earth solutions include Solar, Combined Heat and Power, Co-Generation, Control Systems and next-generation, environmentally friendly Battery Backup and Storage Systems.

7.     Historically, BEI has expanded its comprehensive energy solutions offerings through strategic acquisitions of companies that have been providing energy solutions to an established customer base or have developed a proprietary technology that can be utilized by customers to improve equipment reliability, reduce maintenance costs and provide a better overall operating environment. The primary strategic objective for the respective business units is to provide comprehensive energy solutions for building owners and occupants that combine Solar, Combined Heat and Power Generators, and Battery Storage into a single product that can reduce a building's utility derived energy usage and, therefore, its carbon footprint.

**B.     Business Units**

8.     The acquired companies' operational activities are being conducted through the following three business units: Blue Earth Solar ("**BE Solar**"); Blue Earth Combined Heat and Power ("**BE CHP**"); and EnSite Power ("**EnSite**").

9.     The Debtor and its affiliates operate the following business divisions:

a.     *BE Solar:*  BE Solar is the PhotoVoltaic (PV) division for engineering, procurement and construction (EPC) of distributed solar energy generation for commercial and industrial customers.  Distributed Solar PV systems offer customers the benefit of producing their electricity needs onsite, thereby reducing their dependence on the power grid for their energy requirements.  BE Solar builds, owns and operates the power plant or builds it for the customer to own.

BE Solar has built and owned a 500,000 watt solar powered facility on the Island of Oahu, Hawaii, which it sold in 2014.  BE Solar has also bought and sold the Lenape II solar project in Indianapolis, Indiana and is acting as the engineering, procurement and construction (EPC) contractor for the latter project.  It has also built, operates and manages seven solar powered facilities in California and is designing and permitting numerous other projects.  Services offered include the development, engineering, construction, operation and periodic warranty maintenance

3

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

and, in certain cases, financing of small and medium scale alternative/renewable energy plants including solar photovoltaic (PV), Combined Heat and Power ("CHP") or on-site cogeneration.

b. *BE CHP:* BE CHP builds and operates combined heat and power plants for larger manufacturing and processing facilities. BE CHP designs, engineers, and constructs co-generation systems to match the thermal requirements of the host facility. BE CHP's business is premised on taking electricity produced is in excess of the facility requirements and then selling it back to the local power utility. Customers sign long-term power and thermal purchase agreements to fix costs. BE CHP owns and operates the co-generation system and performs all engineering and construction work at no cost to the host.

c. *EnSite Power:* Through two of its subsidiaries, EnSite offers battery backup technologies with Nickel-Zinc chemistry in addition to hardware and software to monitor and control electro-mechanical equipment. EnSite focuses on uninterruptible power supplies for Traffic and Data Center industries, hardware and software to monitor and control electro-mechanical systems for Building Energy Management Systems.

**C. Corporate Governance**

10. In addition to me, Blue Earth's executive officers include: Robert C. Potts (President & Chief Operating Officer), Zeina El-Azzi (Senior Vice-President Corporate Development) and Ruben Fontes (President of Blue Earth Solar, Inc.).

11. The company's other Directors, in addition to me, are: Laird Q. Cagan (Chairman), Robert C. Potts, Gov. Bill Richardson, Michael W. Allman, James A. Kelly and Alan P. Krusi.

**D. Capital Structure**

12. BEI, a Nevada corporation, is a holding company that owns 100% of the outstanding shares of fourteen direct subsidiaries either engaged in the on-going business activities of the company or having no current operations and, therefore, slated for dissolution. BEI's stock has been publicly-traded on The Nasdaq Stock Market under the symbol BBLU. However, on September 15, 2015, BEI received a letter from Nasdaq stating that the bid price of the company's common stock for the prior 30 consecutive trading days had closed below the minimum $1.00 per share required for continued listing. On March 16, 2016, BEI received a staff determination letter from Nasdaq stating

4

that it did not appear to Nasdaq that it is possible for BEI to cure the bid price deficiency required for continued listing. Upon its bankruptcy filing, BEI would be subject to delisting under Nasdaq Listing Rules 5101, 5110(b), and IM 5101-1. Accordingly, BEI's common stock will be scheduled for delisting from The Nasdaq Capital Market, suspended at the opening of business on March 28, 2016, and removed from listing and registration on The Nasdaq Stock Market.

13.     BEI's direct subsidiaries are:

     a.     Blue Earth Capital, Inc., a Nevada corporation, has no business operations;

     b.     Blue Earth CHP, Inc., a Utah corporation, operates the company's BE CHP business unit. It is the 100% owner of nine subsidiaries, of which, two have co-generation plants and the others have expressions of interests for co-generation plants: Eight are Nevada limited liability companies (Live Oak Heat & Power, LLC; Marshalltown Heat & Power, LLC; Mt. Pleasant Heat & Power, LLC; Plainwell Heat & Power, LLC; Souderton Heat & Power LLC; Sumter Heat & Power, LLC; Tolleson Heat & Power, LLC; and Worthington Heat & Power, LLC); one subsidiary, Brooks Heat & Power Ltd., is a British Columbia, Canada corporation;

     c.     Blue Earth Generator, Inc., a Nevada corporation, utilizes experienced consultants, developers, engineers, service technicians and financial professionals to provide customers with services necessary in completing and running a successful power generation system. The company is based in New York and also leases property in New Jersey to store inventory and equipment, to make repairs and conduct other maintenance activities;

     d.     Blue Earth Solar, Inc., a California corporation, operates the company's BE Solar business unit. It owns two subsidiaries: Blue Earth Solar Oregon, LLC, a Nevada limited liability company, and ecoLegacy Gas & Power, LLC, a California limited liability company which has no current business operations;

     e.     Blue Earth Tech, Inc., a Nevada corporation, employs, pays and provides health and other benefits to nearly all employees of BEI and its subsidiaries (with the exception of EnSite Power, Inc.). BETI borrows from BEI to fund payroll obligations and holds intercompany receivables from affiliates largely on account of payroll liabilities. BETI is a debtor in these bankruptcy cases;

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

5

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

f. EnSite Power, Inc.,[2] a Delaware corporation, owns two technology business units and the proprietary technology assets. Specifically, EnSite Power owns Blue Earth Energy Power Solutions, LLC, an Oregon limited liability company, which includes the UPStealth® NiZn Battery Management/Backup System, as well as Blue Earth Power Performance Solutions, Inc., an Oregon corporation, which includes the Real-Time Intelligence Edge (RTi Edge™) Building Energy Management System. The majority of EnSite Power employees are located in Wilsonville, Oregon, where the company manufactures its UPStealth® NiZn based intelligent digital battery backup system for signalized traffic intersections, and the RTi Edge™ Building Energy Management System. As of October 2014, EnSite Power owns a 24.4% interest in PowerGenix Systems, Inc., a Delaware corporation;

g. E2B Growth, Inc., a Nevada corporation, has no business operations;

h. Maili PV-01 LLC, a Hawaii limited liability company, and Maili PV-03 Limited; Maili PV-05 Limited; Maili PV-06 Limited; and Makaha PV-02 Limited, each a Hawaii corporation, relate to the following solar projects, respectively: Melga Solar Project, RNI1 Solar Project; Sabrina Solar Project; Cozzens Solar Project; and Kamata Solar Project;

i. Blue Earth Energy Management Services, Inc., a California corporation: This entity has no business operations; and

j. Blue Earth Finance, Inc., a Nevada corporation: This entity has no business operations.

14. An organizational chart showing the relationships among BEI and its subsidiaries is attached hereto as **Exhibit "A"**.

**E.** **Summary of Prepetition Debt**

15. In addition to the summary below, the Debtors' significant prepetition liabilities are described in more detail in part II of this Declaration below in connection with the DIP Financing Motion (as such term is defined below).

---

[2] BEI owns approximately 96% of the equity interests in EnSite.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

**Jackson Investment Group LLC**

16.     On September 10, 2015, BEI entered into a Note Purchase Agreement ("**JIG NPA**") with Jackson Investment Group LLC ("**JIG**") pursuant to which a 15% senior secured note in the principal amount of $10,600,000 was issued with a maturity date of February 29, 2016.  On December 11, 2015, BEI borrowed $7,154,659 from JIG under the JIG NPA, evidenced by a 9% senior secured note also due on February 29, 2016.  This loan was made, in part, to repay an October 23, 2015 note in the amount of $5,154,508 issued by the company to JIG.  Interest is payable on the Maturity Date in cash or, at BEI's option, in BEI Common Stock at $0.50 per share.  As of the Petition Date, the Debtors were indebted to JIG in an amount (including certain principal default amounts) of not less than approximately $21,747,056, plus all accrued and unpaid default principal amounts, interest (including default interest), expenses and fees (including late fees).

17.     As of the Petition Date, JIG owned approximately 13% of the voting securities of BEI, representing 13,995,618 common shares.  JIG has rights to acquire additional shares, which remain unexercised as of the Petition Date.

18.     The Prepetition Collateral excludes certain assets pledged to TCA (as defined below) and the Prepetition Documents contain a subordination provision that subordinates the Prepetition Liens to liens pledged to Laird Q. Cagan (the "**Cagan Subordination**") which subordination is limited to not more than $1,333,147 (less any principal repayments thereof) in secured debt in respect of the Cagan Loan (as defined below) in accordance with Section 28(b) of that certain Pledge and Security Agreement dated March 10, 2015 among Blue Earth and certain of its subsidiaries and the Prepetition Lender, and as more particularly set forth in the Prepetition Documents.  The Prepetition Lender and DIP Lender are reviewing the interests of TCA and Laird Q. Cagan, and expressly reserve all rights as to the validity, priority, perfection or extent of the interests of TCA and Laird Q. Cagan.

**TCA Global Credit Master Fund LP**

19.     BEI and twelve of its direct and indirect wholly-owned subsidiaries entered into a Credit Agreement with TCA Global Credit Master Fund LP ("**TCA**"), dated as of January 31, 2013, effective February 22, 2013 and last amended on July 6, 2015 (the "**TCA Agreement**"). Pursuant to

the Second Amendment to the TCA Agreement, dated February 24, 2015, TCA loaned BEI $3,000,000, secured by 100% of BEI's membership interests in Maili PV 01, LLC, and Blue Earth CHP, Inc.'s, membership interests in Sumter Heat and Power LLC, as well as shares of BEI's Series D Convertible Preferred Stock.

20.     As of February 1, 2016, the principal balance due under the TCA Agreement was $1,029,842.

**Laird Q. Cagan**

21.     Through a series of Promissory Notes, BEI has borrowed funds from Laird Q. Cagan, the Chairman of its Board of Directors.  The notes bear interest at 12% per annum and, per a Security Agreement, dated December 12, 2012, BEI's obligations to Cagan are secured by all of BEI's rights and interests with respect to five PV installations in Southern California in connection with a Solar PV Joint Development Agreement, dated August 14, 2012, with Sunvalley Solar, Inc. Cagan entered into a Subordination of Loans Agreement with TCA, dated January 31, 2013.  The subordination provisions are discussed more fully in the Debtors' motion regarding postpetition financing filed concurrently with my declaration.

22.     Cagan asserts an indebtedness of $1,704,058 as of February 24, 2016.  Of this amount, $1,333,000 constitutes a permitted indebtedness under the JIG NPA as of March 2015.

**F.     Events Leading to Chapter 11 Filings**

23.     On February 1, 2016, BEI failed to make a payment to TCA of $177,697.58 for interest and principal. In addition, on February 24, 2016, BEI failed to pay TCA the final investment banking fee of $100,000.  The next day, TCA declared BEI to be in default of the TCA Agreement. TCA advised the company that it had ten days from February 25, 2016, to remedy or cure the default.  TCA warned that if the company was unable to cure the default, TCA may declare the outstanding principal balance of $1,029,842.13 under the note, together with all other obligations due under the note and loan documents immediately due and payable, together with all accrued and unpaid interest at a default rate of 17% per annum, and pursue all of its rights and remedies, including the conversion of its Convertible Preferred Stock into common stock at the average closing

price of the Company's common stock for the 10 Business Days immediately preceding a Conversion Notice.

24.     The company also failed to make the February 1, 2016, interest payment to JIG and cure the default within three (3) Business Days.  Upon this uncured default, interest began to accrue at 21% per annum and JIG has the right to demand payment of a "Mandatory Default Amount" equal to 115% of the principal amount of the Note (or $12,190,000), together with interest, fees, expenses and all other amounts owed under the JIG NPA and all ancillary agreements.  An additional $250,000 principal amount was borrowed from JIG on February 11, 2016.  Commencing five (5) days after the occurrence of an Event of Default, the interest rate on this recent note increases from 9% to 18% per annum and a "Mandatory Default Amount" equal to 118% (or $295,000) of the principal amount of the note is to be paid , plus all accrued and unpaid interest thereon.  The company did not pay two of its notes to JIG that matured on February 29, 2016.  Thus, upon payment default of all notes after an uncured default, JIG asserts an aggregate principal indebtedness of $21,894,580, plus interest, fees, and expenses.

25.     On March 1, 2016, JIG provided BEI and its guarantor subsidiaries with a Notice of Default, thereby putting substantially all of the company's assets at risk of foreclosure (other than those pledged to TCA, and certain other assets).  BEI has been in debt restructuring discussions with JIG and has been actively seeking project financing which would be used to repay a substantial portion of its indebtedness to JIG.  However, the company has been unable to access the equity markets given the deterioration of its market price, as well as general market conditions.

26.     The company commenced these cases in order to obtain necessary financing and restructure its balance sheet through a debt-for-equity swap with JIG to be implemented through a chapter 11 plan.

**G.      BEI's Restructuring**

27.     During the next several weeks, the Debtors intend to file a proposed plan of reorganization (the "**Plan**"). As will be set forth in greater detail in the Plan, the Debtors will implement a balance sheet restructuring by seeking to convert the secured claims held by JIG into the equity of the reorganized Debtor.

9

As part of that proposed restructuring, JIG is in negotiations with management of EnSite to: (i) currently allow EnSite management to provide financing to EnSite senior to JIG's secured position and (ii) in the event the secured claims against BEI and BETI held by JIG are converted into the equity of the reorganized Debtor, allow EnSite's management to buy out the reorganized Debtors' equity in EnSite.

## III.

## PART II

**A.    First Day Motions**

28.    In order to enable the Debtors to minimize the adverse effects of the commencement of their bankruptcy cases, the Debtors have requested various types of relief in the motions filed concurrently with this Declaration (each, a "**First Day Motion**" and collectively, the "**First Day Motions**").  Capitalized terms not otherwise defined herein shall have the same meanings as set forth in the relevant First Day Motion listed below.

29.    I have reviewed each of these First Day Motions (including the exhibits and schedules thereto), and I incorporate by reference the factual statements set forth in the First Day Motions.  The facts stated therein are true and correct to the best of my knowledge, information and belief, and I believe that the type of relief sought in each of the First Day Motions is: (a) necessary to enable the Debtors to operate under chapter 11 with minimal disruption to its current business operations; and (b) essential to maximizing the value of the Debtors' assets for the benefit of its estates and creditors.

30.    It is my further belief that, with respect to those First Day Motions requesting the authority to pay prepetition claims or to continue selected prepetition programs (e.g., those First Day Motions seeking relief related to the Debtors' obligations to their employees, customers, vendors, and certain taxing authorities), the relief requested is essential to the Debtors' efforts to preserve and maximize value in these cases and avoid immediate and irreparable harm to the Debtors and their estates.

31.    I believe that any diminution in the relief requested in the First Day Motions could have an immediate and irreparably harmful impact upon the going concern value of the estates, to

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

the detriment of all of the Debtors' stakeholder constituencies. I believe that payment of the prepetition claims identified in the First Day Motions will forestall such irreparable harm and that all the Debtors' creditors will ultimately benefit from the relief requested therein.

**B.**     **Responsible Individual Application**

32.     By the Responsible Individual Application, the Debtors seek to approve my appointment as the designated individual with primary responsibility for the duties and obligations of the Debtors during their chapter 11 cases.

33.     My contact information is:

    G. Robert Powell, CEO
    Blue Earth, Inc.
    235 Pine Street, Suite 1100
    San Francisco, CA 94104
    Telephone:     (415) 964-4411

**C.**     **Motion for DIP Financing**

34.     The Debtors have an urgent and immediate need for access to cash collateral and borrowings under the DIP Credit Facility with the DIP Lender in the principal amount of up to $3 million following entry of the Final Order, of which $1 million would be available under the proposed Interim Order.

35.     Without the proposed postpetition financing and use of cash collateral, I believe that the Debtors will not have any liquidity to operate their business, and therefore will be unable to fund ordinary course expenditures or pay the expenses necessary to administer their chapter 11 cases. Simply put, without access to financing and continued use of cash collateral, the Debtors (and their subsidiaries) will be required to cease operations and liquidate other than as a going concern, causing irreparable harm to the Debtors, their estates, and creditors. Accordingly, I think that the Debtors have an urgent and immediate need for the borrowings under the DIP Credit Facility and use of cash collateral contemplated in the DIP Financing Motion.

36.     <u>September 2015 Secured Note</u>: Pursuant to that certain Note Purchase Agreement, dated as of September 10, 2015 (as previously amended by various omnibus amendment agreements entered into among Blue Earth, the Guarantors and the Prepetition Lender, and as further amended,

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

11

restated, supplemented or otherwise modified from time to time in accordance with the terms thereof, the "**NPA**"), by and between the Prepetition Lender and Blue Earth, Blue Earth issued a 15% Senior Secured Note due February 29, 2016 in favor of the Prepetition Lender on September 10, 2015 in the original principal amount of $10,600,000 (the "**September 2015 Secured Note**"). All obligations of Blue Earth arising under the September 2015 Secured Note, including all principal, accrued or hereafter accruing interest, fees, costs, charges, expenses (including any and all attorneys', accountants', appraisers' and financial advisors' fees and expenses that are chargeable, reimbursable or otherwise payable under the Prepetition Documents) and obligations for the performance of covenants, tasks or duties, or for the payment of monetary amounts owing to the Prepetition Lender by Blue Earth, of any kind or nature, whether or not evidenced by any note, agreement or other instrument shall hereinafter be referred to as the "**September 2015 Secured Note Obligations**."

37.     The proceeds of the September 2015 Secured Note were used, among other things, to refinance (the "**Prior Refinancing**") that certain 12% Senior Convertible Note, in the principal amount of $10,000,000 issued on March 10, 2015 by Blue Earth to Prepetition Lender pursuant to that certain Note and Warrant Purchase Agreement dated as of March 10, 2015 by and among Blue Earth and the Prepetition Lender.  In connection with the Prior Refinancing, the Guarantors (defined below) and Blue Earth entered in that certain Omnibus Amendment and Joinder Agreement dated as of September 10, 2015 pursuant to which, among other things, Blue Earth and the Guarantors agreed that (i) the Prepetition Note Security Agreement (defined below) secured all obligations of Blue Earth under the NPA and the September 2015 Secured Note and all guaranty obligations of the Guarantors under the Prepetition Guaranty Agreement (defined below), and (ii) that the guarantors guarantied all obligations of Blue Earth under the NPA and the September 2015 Secured Note pursuant to the Prepetition Guaranty Agreement (defined below).  A similar omnibus agreement was entered into in connection with each subsequent issuance of Prepetition Secured Notes.

38.     December 2015 Secured Note:  Pursuant to the NPA, Blue Earth issued a 9% Senior Secured Note due February 29, 2016 in favor of the Prepetition Lender on December 11, 2015 in the original principal amount of $7,154,639 (the "**December 2015 Secured Note**").  All obligations of

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

Blue Earth arising under the December 2015 Secured Note, including all principal, accrued or hereafter accruing interest, fees, costs, charges, expenses (including any and all attorneys', accountants', appraisers' and financial advisors' fees and expenses that are chargeable, reimbursable or otherwise payable under the Prepetition Documents) and obligations for the performance of covenants, tasks or duties, or for the payment of monetary amounts owing to the Prepetition Lender by Blue Earth, of any kind or nature, whether or not evidenced by any note, agreement or other instrument shall hereinafter be referred to as the "**December 2015 Secured Note Obligations**."

39. <u>First February 2016 Secured Note</u>: Pursuant to the NPA, Blue Earth issued a 9% Senior Secured Note due February 29, 2016 in favor of the Prepetition Lender on February 11, 2016 in the original principal amount of $250,000 (the "**First February 2016 Secured Note**"). All obligations of Blue Earth arising under the First February 2016 Secured Note, including all principal, accrued or hereafter accruing interest, fees, costs, charges, expenses (including any and all attorneys', accountants', appraisers' and financial advisors' fees and expenses that are chargeable, reimbursable or otherwise payable under the Prepetition Documents) and obligations for the performance of covenants, tasks or duties, or for the payment of monetary amounts owing to the Prepetition Lender by Blue Earth, of any kind or nature, whether or not evidenced by any note, agreement or other instrument shall hereinafter be referred to as the "**First February 2016 Secured Note Obligations**."

40. <u>Second February 2016 Secured Note</u>: Pursuant to the NPA, Blue Earth issued a 9% Senior Secured Note due March 31, 2016 in favor of the Prepetition Lender on February 29, 2016 in the original principal amount of $100,000 (the "**Second February Secured 2016 Note**"). All obligations of Blue Earth arising under the Second February 2016 Secured Note, including all principal, accrued or hereafter accruing interest, fees, costs, charges, expenses (including any and all attorneys', accountants', appraisers' and financial advisors' fees and expenses that are chargeable, reimbursable or otherwise payable under the Prepetition Documents) and obligations for the performance of covenants, tasks or duties, or for the payment of monetary amounts owing to the Prepetition Lender by Blue Earth, of any kind or nature, whether or not evidenced by any note,

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

agreement or other instrument shall hereinafter be referred to as the "**Second February 2016 Secured Note Obligations.**"

41.     First March 2016 Secured Note:  Pursuant to the NPA, Blue Earth issued a 9% Senior Secured Note due May 18, 2016 in favor of the Prepetition Lender on March 18, 2016 in the original principal amount of $150,000 (the "**First March Secured 2016 Note**").  All obligations of Blue Earth arising under the First March 2016 Secured Note, including all principal, accrued or hereafter accruing interest, fees, costs, charges, expenses (including any and all attorneys', accountants', appraisers' and financial advisors' fees and expenses that are chargeable, reimbursable or otherwise payable under the Prepetition Documents) and obligations for the performance of covenants, tasks or duties, or for the payment of monetary amounts owing to the Prepetition Lender by Blue Earth, of any kind or nature, whether or not evidenced by any note, agreement or other instrument shall hereinafter be referred to as the "**First March 2016 Secured Note Obligations.**"

42.     Second March 2016 Secured Note:  Pursuant to the NPA, Blue Earth issued a 9% Senior Secured Note due May 18, 2016 in favor of the Prepetition Lender on March 21, 2016 in the original principal amount of $569,581.55 (the "**Second March Secured 2016 Note**" and together with the September 2015 Secured Note, the December 2015 Secured Note, the First February 2016 Secured Note, the Second February Secured Note and the First March Secured Note, the "**Prepetition Secured Notes**").  All obligations of Blue Earth arising under the Second March 2016 Secured Note, including all principal, accrued or hereafter accruing interest, fees, costs, charges, expenses (including any and all attorneys', accountants', appraisers' and financial advisors' fees and expenses that are chargeable, reimbursable or otherwise payable under the Prepetition Documents) and obligations for the performance of covenants, tasks or duties, or for the payment of monetary amounts owing to the Prepetition Lender by Blue Earth, of any kind or nature, whether or not evidenced by any note, agreement or other instrument shall hereinafter be referred to as the "**Second March 2016 Secured Note Obligations**" and together with the September 2015 Secured Note Obligations, the December 2015 Secured Note Obligations, the First February 2016 Secured Note Obligations, the Second February 2016 Secured Note Obligations and the First March Secured Note Obligations, the "**Prepetition Secured Notes Obligations.**"

Case: 16-30296    Doc# 3    Filed: 03/21/16    Entered: 03/21/16 15:39:52    Page 14 of 34

43. <u>Prepetition Guaranties and Collateral</u>.  Pursuant to (i) that certain Guaranty, dated as of March 10, 2015, by and among the following subsidiaries of Blue Earth: Blue Earth Generator, Inc., Blue Earth Finance, Inc., Blue Earth Management Services, Inc., Blue Earth Solar, Inc., Blue Earth Power Performance Solutions, Inc., Ecolegacy Gas & Power, LLC, Blue Earth Energy Power Solutions, LLC, Blue Earth Tech, Inc., Blue Earth CHP, Inc., Brooks Heat & Power LTD, E$^2$B Growth, Inc., EnSite Power, Inc. (collectively, the "**Guarantors**") in favor of the Prepetition Lender (as previously amended by various omnibus amendment agreements entered into among Blue Earth, the Guarantors and the Prepetition Lender, and as further amended, restated, supplemented or otherwise modified from time to time in accordance with the terms thereof, the "**Prepetition Guaranty Agreement**"), each of the Guarantors, among other things, guaranteed the payment of all of the Prepetition Secured Notes Obligations (all of the obligations of the Guarantors in favor of the Prepetition Lender under the Prepetition Guaranty Agreement are referred to herein collectively as the "**Prepetition Secured Guaranty Obligations**"; together with the Prepetition Secured Notes Obligations referred to herein collectively as the "**Prepetition Secured Obligations**"); and (ii) that certain Pledge and Security Agreement, dated as of March 10, 2015, by and among Blue Earth, the Guarantors, the Prepetition Lender, and each other party signatory thereto (as previously amended by various omnibus amendment agreements entered into among Blue Earth, the Guarantors and the Prepetition Lender, and as further  amended, restated, supplemented or otherwise modified from time to time in accordance with the terms thereof, the "**Prepetition Note Security Agreement**" and together with the Guaranty, the NPA and the Prepetition Secured Notes, the "**Prepetition Documents**"), Blue Earth and each of the Guarantors granted to the Prepetition Lender to secure all of the Prepetition Secured Obligations, a security interest in and continuing lien (the "**Prepetition Liens**") on substantially all of Blue Earth's and each Guarantor's assets (subject to certain exceptions agreed by the parties thereto as set forth in the Prepetition Documents), including, but not limited to, all of Blue Earth's and such Guarantor's accounts, chattel paper, documents, general intangibles, goods (including, without limitation, inventory, equipment and fixtures), instruments, intellectual property, investment property, deposit accounts, money, cash or cash equivalents, commercial tort claims, a pledge of one hundred percent (100%) of the capital stock of each of its domestic subsidiaries

15

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

(subject to certain exceptions agreed by the parties thereto as set forth in the Prepetition Documents) and all proceeds, products, accessions, rents and profits of or in respect of any of the foregoing, in each case, whether then owned or existing or thereafter acquired or arising, to secure. All collateral granted or pledged by Blue Earth and the Guarantors pursuant to the Prepetition Documents shall collectively be referred to herein as the "**Prepetition Collateral**."

44. The Prepetition Collateral excludes certain assets pledged to TCA (as defined below) and the Prepetition Documents contain a subordination provision that subordinates the Prepetition Liens to liens pledged to Laird Q. Cagan (the "**Cagan Subordination**") which subordination is limited to not more than $1,333,147 (less any principal repayments thereof) in secured debt in respect of the Cagan Loan (as defined below) in accordance with Section 28(b) of that certain Pledge and Security Agreement dated March 10, 2015 among Blue Earth and certain of its subsidiaries and the Prepetition Lender, and as more particularly set forth in the Prepetition Documents. The Prepetition Lender and DIP Lender are reviewing the interests of TCA and Laird Q. Cagan, and expressly reserve all rights as to the validity, priority, perfection or extent of the interests of TCA and Laird Q. Cagan..

45. I understand that the Debtors and their professionals have obtained UCC searches and otherwise reviewed the Prepetition Documents to determine that the Prepetition Lender has a valid security interest and lien in substantially all of the Debtors' assets.

46. As of the Petition Date, the Debtors were indebted to the Prepetition Lender for the aggregate principal balance of the Prepetition Secured Notes Obligations in an amount not less than approximately $21,747,056, plus all accrued and unpaid default principal amounts, interest (including default interest) expenses and fees (including late fees) under the Prepetition Secured Notes and other Prepetition Secured Obligations.

47. TCA Global Credit Master Fund LP. Blue Earth and twelve of its direct and indirect wholly-owned subsidiaries entered into a Credit Agreement with TCA Global Credit Master Fund LP ("**TCA**"), dated as of January 31, 2013, effective February 22, 2013 and last amended on July 6, 2015 (the "**TCA Agreement**"). Pursuant to the Second Amendment to the TCA Agreement, dated February 24, 2015, TCA loaned BEI $3,000,000, secured by 100% of Blue Earth's membership

16

interests in Maili PV 01, LLC, and Blue Earth CHP, Inc.'s, membership interests in Sumter Heat and Power LLC, as well as shares of Blue Earth's Series D Convertible Preferred Stock. As of February 1, 2016, the principal balance due under the TCA Agreement was $1,029,842.

48.     Laird Q. Cagan.  Pursuant to a series of promissory notes issued from 2012 through 2013, Blue Earth borrowed funds from Laird Q. Cagan, an insider of the Debtors.  Blue Earth's obligations under such promissory notes are purportedly secured by all rights and proceeds of five photovoltaic installations in southern California in connection with a Solar PV Joint Development Agreement dated August 14, 2012 with Sunvalley Solar, Inc.  As of the Petition Date, the principal balance due to Mr. Cagan under the notes was $1,333,000.

49.     The Debtors require immediate access to the DIP Credit Facility and cash collateral in order to sustain their ongoing operations and administer these chapter 11 cases.  The Debtors have employees and vendors who depend on the Debtors to satisfy their obligations.  The Debtors fully intend to satisfy such obligations on a postpetition basis.  Absent immediate funding through the DIP Credit Facility and use of cash collateral, however, I believe that the Debtors would be forced to shut down their business and convert these cases to chapter 7, which would have a tremendously adverse effect on the Debtors' estates, their employees, vendors, and other constituents.

50.     Prior to agreeing to enter into the DIP Credit Facility with the DIP Lender, the Debtors contacted alternative funding sources.  The Debtors were advised that no provision of credit would be made junior to the liens and claims of the Prepetition Lender.  As a result, the Debtors and their professionals negotiated with the DIP Lender and its professionals as to the terms of the DIP Credit Facility and the proposed Interim Order, including consensual priming of the Prepetition Secured Obligations and access to cash collateral.  Such negotiations were conducted at arm's length and in good faith.  I believe that the DIP Credit Facility and the other terms of the proposed Interim Order are the best credit terms currently available to these estates.

51.     Despite efforts to locate alternative funding sources, the Debtors do not have access to financing on alternative or better terms than the proposed DIP Credit Facility.  Moreover, I do not believe that the Debtors can obtain the financing that they require via unsecured credit.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

52.     In addition, the DIP Credit Facility is essential for the Debtors to continue to operate and to pay for the goods and services that are necessary in the ordinary course of business.

53.     The Debtors propose to grant the DIP Lender certain enhancements as described in more detail in the DIP Financing Motion.  I believe that such enhancements are reasonable in return for the funding available under the DIP Credit Facility.

54.     The best credit terms available to the Debtors are those set forth in the DIP Term Sheet.  Thus, I believe that it is fair, reasonable, and necessary for the Court to approve the DIP Credit Facility and enter the Interim Order (and, subsequent to the Final Hearing, the Final Order). In addition to representing the best terms presently available to Debtors, the proposed DIP Credit Facility is also in the best interests of the Debtors' estates.  It will provide the Debtors needed funding to maintain and operate their business and administer their chapter 11 cases.  The DIP Credit Facility therefore is plainly in the best interests of Debtors' estates.

55.     To the best of my knowledge, the DIP Lender has offered to extend the financing under the DIP Credit Facility in good faith.

56.     I believe that the DIP Lender and the Prepetition Lender consent to the use of cash collateral is consistent with the Budget and such use is absolutely necessary to continue operations and maximize the value of the Debtors' estates.

57.     The urgent need to preserve the Debtors' business, and avoid immediate and irreparable harm to the estate, makes it imperative that the Debtors be authorized to access postpetition financing on an interim basis and use cash collateral, pending the Final Hearing, in order to continue their operations and administer these chapter 11 cases.  Without the ability to borrow funds under the DIP Term Sheet and use cash collateral, the Debtors would be unable to meet their postpetition obligations or to fund their working capital needs, thus causing irreparable harm to the value of the Debtors' estates and ending the Debtors' reorganization efforts.

**D.      Motion to Maintain Existing Bank Accounts
and Continue Use of Cash Management System**

58.     Pursuant to the Cash Management Motion, the Debtors seek authorization for the continued use of the Debtors' existing bank accounts and cash management system on the grounds

Pachulski Stang Ziehl & Jones LLP
Attorneys At Law
San Francisco, California

that such use is necessary for the Debtors' continued operations. Specifically, the Debtors seek an order: (a) authorizing continued use of the Cash Management System (defined below); (b) authorizing the Debtors to maintain their prepetition bank accounts (collectively, the "**Bank Accounts**") identified on Exhibit "A" annexed to the Cash Management Motion; (c) authorizing the Debtors to continue using their existing business forms and checks; and (d) to the extent applicable, waiving of any stay. The Debtors request expedited relief as immediate relief is necessary to avoid immediate and irreparable harm to the estates. A proposed form of order is annexed to the Cash Management Motion as Exhibit "B".

59.     In the ordinary course of business, the Debtors maintain a cash management system that provides well-established processes for the collection, concentration, management, disbursement, and investment of funds generated and used in their operations (the "**Cash Management System**"). The Cash Management System is a centralized process specifically designed to accommodate the Debtors' business operations.

60.     The Cash Management System consists of: (a) a checking account held by BEI, used to pay expenses incurred by the Blue Earth enterprise and to receive and disburse equity and debt proceeds (the "**Operating Account**"); (b) a money market account denominated in Canadian dollars held by BEI for the purpose of receiving and holding Goods and Services Tax (GST) refunds from the Canada Revenue Agency and other receipts relating to BEI's indirect subsidiary, Brooks Heat & Power, Ltd., a British Columbia, Canada, corporation (the "**Brooks Canada Account**"); (c) a payroll account held by BETI, used to pay Blue Earth employees enterprise-wide (the "**Payroll Account**"); and (d) a deposit account held by BEI used to fund BEI's subsidiary, Blue Earth CHP, Inc. (the "**BE CHP Account**"), which account will be closed within a few days of the Petition Date. The Bank Accounts are held at Wells Fargo Bank, which, I am advised, is a depository on the United States Trustee Region 17 List of Authorized Depositories.

61.     Historically, BEI periodically transferred funds from the Operating Account to its non-debtor subsidiaries to finance operations (collectively, the "**Intercompany Transfers**"). No Intercompany Transfers will take place during the pendency of these chapter 11 cases except as

Case: 16-30296   Doc# 3   Filed: 03/21/16   Entered: 03/21/16 15:39:52   Page 19 of 34

contemplated in any debtor in possession financing authorized by the Court or by other order of the Court.

62. In the ordinary course of the operation and maintenance of the Cash Management System, the Debtors incur routine bank charges and fees relating to the administration of the Cash Management System. While it is difficult to readily determine the aggregate amount of unpaid prepetition banking fees as of the Petition Date (given, for example, the bank's varying timing of charging/deducting such fees from a given account), on average, the Debtors pay approximately $1,000.00 in monthly banking fees and charges associated with the Bank Accounts.

63. I understand that the United States Trustee has established certain operating guidelines for debtors in possession. One such provision requires a chapter 11 debtor in possession to close all existing bank accounts and open new bank accounts. This requirement, designed to provide a clear line of demarcation between prepetition and postpetition claims and payments, helps protect against the inadvertent payment of prepetition claims by preventing banks from honoring checks drawn before the Petition Date.

64. Through the Cash Management Motion, the Debtors seek a waiver of the United States Trustee's requirement that the Bank Accounts be closed and new postpetition bank accounts be opened. If strictly enforced in these chapter 11 cases, I believe that the requirement to close and open new accounts would cause a disruption in the Debtors' activities and would impair the Debtors' ability to operate.

65. I think that the maintenance of the Bank Accounts and the Cash Management Systems will greatly facilitate the Debtors' operations during the pendency of these chapter 11 cases. The continued maintenance of the Debtors' Bank Accounts is of paramount importance because the accounts are used to effectuate payments to their employees and vendors.

66. If the Bank Accounts were closed, the Debtors would have to open new accounts and then attempt to arrange alternative electronic and manual payment procedures for payments out of the Debtors' accounts, which would disrupt the flow of postpetition disbursements. In addition, closing the Bank Accounts would require the Debtors to cancel and reinstitute wire transfer instructions, which would be difficult to modify under exigent circumstances. I believe that these

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

disruptions would severely impact and could irreparably harm the Debtors' ability to operate their business at this critical juncture while they transition to their status debtors in possession. To avoid these disruptions and delays in the operation of the Debtors' business, I think that the Debtors should be permitted to maintain their existing Bank Accounts and, if necessary, to open new accounts as debtor in possession accounts or to close any unneeded existing accounts.

67. To guard against improper transfers resulting from the postpetition honoring of prepetition checks, the Debtors will promptly notify Wells Fargo Bank not to honor checks drawn on the Debtors' accounts before the Petition Date, except upon limited Court-approved exceptions. Subject to a prohibition against honoring prepetition checks or offsets without specific authorization from this Court, the Debtors request that they be authorized to maintain and continue the use of these accounts in the same manner and with the same account numbers, styles and document forms as those employed during the prepetition period.

68. If the relief requested herein is granted, the Debtors will not pay, and Wells Fargo Bank will be required not to pay, any debts incurred before the Petition Date, other than as specifically authorized through this Motion or otherwise ordered by the Court.

69. I believe that the Bank Accounts and the Cash Management System are well-suited to the Debtors' business needs and operations. To require the Debtors to close the Bank Accounts and establish new accounts would require considerable time and expense to the Debtors' estates. Similarly, continued use of the Operating Account is vital to the Debtors' operations. Permitting the Debtors to continue using their existing Bank Accounts is essential to a smooth and orderly transition of the Debtors into chapter 11 and to avoid disruption of their business and operations.

70. The Debtors respectfully submit that, under the circumstances, the maintenance of the Cash Management System and Bank Accounts in substantially the same form as it existed prior to the Petition Date (or as the Debtors may modify the system in the ordinary course of business) is in the best interests of the Debtors' estate and creditors.

71. As part of the relief requested, the Debtors also seek a waiver of the requirement by the United States Trustee for Region 17 to establish specific bank accounts for tax payments. *See* Region 17 United States Trustee Guidelines, § 4.4.6. I believe that the Debtors' tax obligations can

be paid most efficiently out of the existing Bank Accounts, that the U.S. Trustee can adequately monitor the flow of funds into, among, and out of the Bank Accounts through the Debtors' required monthly operating reports, and that the creation of new debtor in possession accounts designated solely for tax obligations would be unnecessary and inefficient.

72.     The Debtors hereby request authority to maintain the Bank Accounts and utilize them pursuant to the existing Cash Management System described above. I do not believe that allowing the Debtors to do so will prejudice their estates or any party-in-interest. If the relief requested herein is granted, the Debtors will not pay any debts incurred before the Petition Date unless specifically authorized by this Court pursuant to a separate motion.

73.     In order to minimize confusion, the Debtors intend to provide Wells Fargo Bank with a list of outstanding prepetition checks identifying the Prepetition Claims Checks within three (3) business days of the entry of any order authorizing such Prepetition Claims Checks so that it is clear which checks may be paid.

**E.     Wage and Benefit Motion**

74.     As of the Petition Date, the Debtors employ twenty Employees, located in California, Utah, Texas, Colorado, Iowa, New York, Georgia, Kansas, and Canada. The Debtors' workforce is critical to their business operations.

75.     BETI is the employer for each of the Employees. However, the Employees provide services to the Debtors and the Debtors' non-debtor subsidiaries. BETI has no business other than the provision of Employees to BEI and its subsidiaries. Specifically, thirteen Employees provide services to Debtor Blue Earth, Inc., two Employees provide services to non-debtor Blue Earth Generator, Inc., and five Employees provide services to non-debtor Blue Earth CHP, Inc. Each of the Employees is essential not only to the continued, uninterrupted operation of the Debtors' business, but to effectuating the orderly administration of the Debtors' bankruptcy cases and a successful restructuring.

76.     **Salaries and Wages.** The Employees are paid twice per month on the 15th and the last day of the month. When Employees are paid on the 15th of the month, it is for wages/salary earned from the 1st through the 15th of that month. BETI distributes payroll to all Employees

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

through direct deposit. The Debtors' next payroll (for both salaried and hourly Employees) is scheduled for March 31, 2016, and relates to the period March 16, 2016 through March 31, 2016. The aggregate wages/salaries for this payroll period are estimated to be $147,300. As of the Petition Date, the Employees will be owed 5 days of Prepetition Wages. Accordingly, the Debtors request authority to pay the Prepetition Wages when due on the next payroll date of March 31, 2016. In addition, the Debtors seek authorization, to the extent necessary, to continue paying Employees for their services after the Petition Date in the ordinary course of business, which for each bi-monthly pay period I estimate to be $147,300.

77.   **Employment Taxes and Fees.**   In the ordinary course of business, the Debtors take certain employee deductions (as applicable) from their Employees' pay, including, *inter alia*: (a) employer payroll taxes and the employee portion of FICA and unemployment taxes (comprising most of the employee deductions); (b) Employee contributions to health and disability related benefits (discussed further below); and (c) legally ordered deductions such as wage garnishments, child support and tax levies. The Debtors forward amounts equal to the applicable employee deductions (which prepetition typically totaled approximately $37,500 per bi-monthly pay period) to the appropriate third-party recipients, including taxing authorities.

78.   **PTO.**   In the ordinary course, the Debtors provide PTO to their employees. The Debtors do not intend to "cash out" prepetition PTO benefits to the Employees at this time. The Debtors, however, do intend to honor accrued PTO for all employees by allowing Employees to use PTO in the ordinary course. In the event of a postpetition termination of Employees, the Employees will be paid for all unused PTO, including PTO that accrued prior to the Petition Date and other prepetition wages up to $12,475.

79.   **Business Expenses.**   The Debtors customarily reimburse their Employees for business expenses incurred in performing their duties such as travel, meals, mileage, and telephone use. As of the Petition Date, I believe there is approximately $7,500 in prepetition Employee expense reimbursement claims outstanding.

80.   Because of the varying timing of submissions of expense reports by Employees, it is difficult for the Debtors to accurately estimate how much in prepetition Employee expenses may

have accrued. Historically, the Employee expenses average approximately $100,000 per month but that was during the period when the Debtors employed approximately 100 individuals. Currently, the Debtors expect monthly business expenses to be approximately $37,500. The Debtors seek authority, but not direction, to pay any prepetition Employee expenses and to continue to pay them postpetition in the ordinary course of business to Employees to the extent any such claims are posted after the Petition Date. If the Debtors are not granted authority to do so, the individual Employees will bear the burden of paying the Debtors' expenses from their personal funds. This would be patently unjust to the Employees and would only serve to lower Employee morale at a time when the Employees' best efforts are crucial to the Debtors and their estates.

81. **Medical**. BETI pays Anthem (BS/BS) a premium in the approximate amount of $3,500 per month for its employee medical plan. The medical plan is fully funded for employees and funded by the participating Employees for spouses and dependents. The monthly fee/premium is generally paid at the end of the month for coverage during the following month (*i.e.*, paid last week of February for coverage during March). Here, the premium was paid at the end of last month (*i.e.*, February 2016). Nevertheless, the Debtors are seeking authorization to pay any and all prepetition outstanding amounts that may be owed to under their medical plan, which I estimate to be $0.00.

82. **Dental and Vision**. The Debtors offer a dental and vision program to their eligible and participating Employees that is administered by MetLife. The dental plan premiums are paid solely by the participating Employees. The Debtors generally pay these providers bi-monthly in connection with each payroll period by withholding the necessary funds from the participating Employees' payroll. For each payroll period, the premiums are $410.00 and $42.00, respectively. Here, the premiums were paid at the beginning of the month. Nevertheless, the Debtors are seeking authorization to pay any and all prepetition outstanding amounts that may be owed to under their dental and vision plans, which I estimate to be $0.00.

83. **COBRA**. The Debtors seek to continue to perform any obligations under Section 4980B of the Internal Revenue Code to administer Continuation Health Coverage (26 U.S.C. § 4980B) (**"COBRA"**) in respect to one former Employee. Paychex is the third-party COBRA

administrator for the Debtors (the **"COBRA Administrator"**). As of the Petition Date, I estimate that there are no outstanding obligations relating to the prepetition period. However, to maintain Employee morale and ensure the orderly administration of the estates, the Debtors request authority to continue performing in their discretion any COBRA related obligations.

84. **Employee Life and Other Insurance Benefits**. The Debtors also offer eligible Employees premium-based life insurance coverage and accidental death and dismemberment (**"AD&D"**) insurance through Mutual of Omaha. Basic life and AD&D insurance coverage is made available to employees and paid by the Debtors. Short-term and long-term disability is made available to Employees and their spouse and children. The monthly premiums for these policies are approximately $2,000 per month and generally paid at the end of each month for coverage during the following month. I believe that the Debtors are current with respect to these payment obligations. Nevertheless, the Debtors are seeking authorization to pay any and all prepetition outstanding amounts that may be owed to under their employee related insurance plans, which I estimate to be $0.00.

85. **Retirement Benefits Plan**. The Debtors offer eligible Employees the opportunity to participate in a 401(k) Savings and Retirement Plan (**"401(k) Plan"**). The Debtors seek authority to continue to maintain their 401(k) Plan and remit withholdings in the ordinary course of business. As of the Petition Date, there are no outstanding obligations owed on account of the 401(k) Plan.

86. **Workers' Compensation**. Under the laws of various states, the Debtors are required to maintain workers' compensation insurance to provide their Employees with coverage for injury claims arising from or related to their employment with the Debtors. The Debtors maintain a workers' compensation benefits program through ACE Insurance (the **"ACE Workers Comp Program"**). The ACE Workers Comp Program provides benefits to all Employees in each of the states in which the Debtors operate (*i.e.*, for claims arising from or related to the Employee's employment with the Debtors (together with any premiums, surcharges, deductibles and other charges (discussed below) payable to ACE Insurance, the **"ACE Insurance Obligations"**)). Under the ACE Workers Comp Program, ACE Insurance acts as a third party administrator and provides guaranteed cost insurance coverage at the statutorily-required level for the states in which the

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

Debtors operate. The Debtors pay ACE Insurance approximately $17,250 per month for the ACE Workers Comp Program. Given the timing of the bankruptcy filing, I do not believe that the Debtors owe ACE Insurance any premiums on account of prepetition period.

87.     I believe that the Debtors' failure to satisfy outstanding Employee Obligations would create concern and discontent among their Employees, and adversely affect employee morale. Moreover, it would undermine the Debtors' ability to retain its Employees. If the Debtors cannot promptly assure their Employees that, among other things, accrued PTO will be honored, immediate and irreparable harm may result due to the Employees relocating or resigning prior to the consummation of a successful reorganization. The Debtors' ability to honor payroll, expense reimbursements, insurance, retirement benefits, workers' compensation benefits and accrued PTO is important to maintaining continuity and order to the Debtors' business activity through retention of their Employees. At this critical state of this case, the Debtors cannot risk a significant disruption in their operations caused by low employee morale.

88.     The Debtors have sufficient operating cash to satisfy the foregoing Employee Obligations as they come due in the ordinary course of business. Moreover, the accrued PTO and other prepetition wages for all Employees will be honored up to the $12,475 per employee limit set by section 507(a)(4) of the Bankruptcy Code. The cost of the prepetition medical insurance, workers' compensation premiums, and other employee contributions is not expected to exceed the amount limitation per employee pursuant to section 507(a)(5) of the Bankruptcy Code. In addition, I believe that the relevant time periods for which payment is requested fall within the 180 days prior to the Petition Date as required by sections 507(a)(4) and (a)(5) of the Bankruptcy Code. As these Employees are necessary to maintain the value of the Debtors as a going concern, I believe that such a request is modest in light of the benefit to the estate.

**F.      Motion Establishing Notification,
         Objection and Hearing Procedures for Transfers of Equity Securities**

89.     I understand that, as of the date hereof, the Debtors have incurred consolidated net operating loss ("**NOL**") of approximately $65 million and the aggregate tax basis of the Debtors'

Case: 16-30296   Doc# 3   Filed: 03/21/16   Entered: 03/21/16 15:39:52   Page 26 of 34

assets substantially exceeds the aggregate value of such assets, resulting in a substantial net "built-in" loss.

90.     I understand that the Debtors' consolidated NOL carryforwards are valuable assets of the Debtors' estates because 26 U.S.C. § 172 ("**Section 172**") generally permits corporations to carry forward NOLs to offset future income, thereby reducing federal income tax liability in future periods. I believe that the Debtors' excess tax basis is a valuable asset because it may reduce Debtors' future taxable income through increased operating deductions (such as, upon the sale of excess inventory and through amortization and depreciation deductions), capital loss deductions or it may offset any subsequent capital appreciation in the assets.  The NOLs carryforwards and certain other tax attributes, including their "built-in" losses (collectively, the "**Tax Attributes**") potentially allow the Debtors to reduce significantly future U.S. federal income tax liability, depending upon future operating results of the Debtors and upon potential asset dispositions, and absent any intervening limitations.

91.     I believe that it is in the best interests of the Debtors and their estates to restrict equity trading that could result in an ownership change prior to consummation of a plan of reorganization.

92.     It is possible that any realistic plan of reorganization will involve the issuance of common stock to creditors in satisfaction, either in whole or in part, of the Debtors' prepetition indebtedness.  In that event, the Debtors may seek to avail themselves of the special relief afforded by Section 382 for changes in ownership under a confirmed chapter 11 plan.  There is a danger, however, that if the relief requested here is not granted, the Debtors could lose the substantial benefits of their NOL carryforwards before their emergence from chapter 11 as a result of continued trading by stockholders in interests in BEI.

93.     If left unrestricted, such trading could severely limit the Debtors' ability to use valuable assets of their estates, namely their NOLs, and could have significant negative consequences for the Debtors, their estates, and the reorganization process

94.     The proposed notice and approval procedures are necessary to preserve the Debtors' NOL carryforwards, which are a valuable asset of the Debtors' estates.  The Debtors' ability to meet

Case: 16-30296   Doc# 3   Filed: 03/21/16   Entered: 03/21/16 15:39:52   Page 27 of 34

the requirements of the tax laws in order to preserve their NOL carryforwards may be seriously jeopardized unless procedures are established to ensure that trading in interests in the Debtors are precluded.

95.     I estimate that the Debtors can use the NOL carryforward to offset future income and eliminate significant income tax liability.  Thus, the NOL carryforward is clearly a valuable asset of the Debtors' estates.

**G.     Application for Order Under 28 U.S.C. § 156(c) Authorizing the Retention of Kurtzman Carson Consultants LLC As Noticing and Claims Agent for Clerk of the Bankruptcy Court Nunc Pro Tunc to the Petition Date (the "KCC Application")**

96.     In connection with KCC's appointment as Claims and Noticing Agent, I understand that, among other things: (a) KCC will not consider itself employed by the United States government and shall not seek any compensation from the United States government in its capacity as Claims and Noticing Agent in these chapter 11 Cases; (b) KCC will not be an agent of the United States and will not act on behalf of the United States; and (c) KCC will not employ any past or present employees of the Debtors in connection with its work as the Claims and Noticing Agent in this chapter 11 Cases.

97.     Subject to this Court's and Clerk's consent and approval, the Debtors have employed KCC to provide the services set forth above pursuant to the terms of the Letter of Agreement between the Debtors and KCC (the "**Agreement**").  A copy of the Agreement is attached as Exhibit "A" to the KCC Application.

98.     Based upon the creditor matrix, there are over 360 creditors or parties-in-interest in these cases in addition to other parties-in-interest who require notice of various specific matters -- in particular, the deadline for filing proofs of claim.  Also, the common stock of BEI is publicly held. In addition, the size of the Debtors' creditor body makes it impractical for the Clerk to send notices and to maintain a claims register.  Accordingly, with the large number of potential creditors that the Debtors have identified, I believe it is in the best interests of the Debtors' estates and their creditors to appoint KCC as agent for the Clerk.

99.     After considering its quality of performance in other cases, I have concluded that KCC is the best choice for Claims and Noticing Agent in these Cases.  I believe that the Agreement

Case: 16-30296   Doc# 3   Filed: 03/21/16   Entered: 03/21/16 15:39:52   Page 28 of 34

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

contemplates compensation at a level that is reasonable and appropriate for services of this nature, and is consistent with the compensation arrangement charged by KCC in other cases in which it has been retained to perform similar services.

100. By appointing KCC as the notice and claims agent in these chapter 11 Cases, I believe that creditors of the Debtors' estates will benefit from KCC's significant experience in acting as a notice and claims agent in other cases and the efficient and cost-effective methods that KCC has developed.

101. KCC has not been paid any sums by the Debtors prior to the Petition Date.

102. To the best of my knowledge, and based upon and except as set forth in the declaration of Evan Gershbein (the "**Gershbein Declaration**"), attached as Exhibit "C" to the KCC Application, KCC does not (a) represent any interest adverse to the Debtors or their estates; (b) have any connection with the Debtors, their creditors, any other party in interest, their respective attorneys and accountants, the United States Trustee, or any person employed in the office of the United States Trustee other than as disclosed herein; (c) hold any claims against the Debtors, or (d) employ any person that is related to a judge of this Court or the United States Trustee for Region 17. In addition, to the best of my knowledge and based on the Gershbein Declaration, KCC is a "disinterested person" under applicable sections of the Bankruptcy Code.

*[Remainder of page intentionally left blank]*

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed this 21st day of March, 2016 at San Francisco, California.

G. Robert Powell

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

DOCS_SF:88407.1 59938/001

**EXHIBIT A**

**(Corp Org. Chart)**

DOCS_SF:88407.1 59938/001

# Entity Org Chart



**Blue Earth, Inc.** *NV*

- 100% — Blue Earth Capital, Inc. *BECI* *NV* — YieldCo
- 100% — Blue Earth CHP, Inc.
- See add'l subs on p. 2-3
- 100% — Blue Earth Energy Management Services, Inc. *CA*
- 100% — Blue Earth Finance, Inc. *NV*

Blue Earth CHP, Inc. subsidiaries:
- 100% — Brooks Heat & Power Ltd *CAN* — Brooks Co-Gen Plant
- 100% — Live Oak Heat & Power, LLC *NV* — Live Oaks Co-Gen Plant
- 100% — Marshalltown Heat & Power, LLC *NV* — Marshalltown Co-Gen Plant
- 100% — Mt Pleasant Heat & Power, LLC *NV* — Mt Pleasant Co-Gen Plant

- 100% — Plainwell Heat & Power, LLC *NV* — Plainwell Co-Gen Plant
- 100% — Souderton Heat & Power LLC *NV* — Souderton Co-Gen Plant
- 100% — Sumter Heat & Power, LLC *NV* — Sumter Co-Gen Plant
- 100% — Tolleson Heat & Power, LLC *NV* — Tolleson Co-Gen Plant
- 100% — Worthington Heat & Power, LLC *NV* — Worthington Co-Gen Plant



PROPRIETARY & CONFIDENTIAL

Case: 16-30296     Doc# 3     Filed: 03/21/16     Entered: 03/21/16 15:39:52     Page 32 of 34



PROPRIETARY & CONFIDENTIAL

02/22/2016



PROPRIETARY & CONFIDENTIAL



Case: 16-30296   Doc# 3   Filed: 03/21/16   Entered: 03/21/16 15:39:52   Page 34 of 34