Jeffrey N. Pomerantz (CA Bar No. 143717)
Debra I. Grassgreen (CA Bar No. 169978)
John W. Lucas (CA Bar No. 271038)
Malhar S. Pagay (CA Bar No. 189289)
PACHULSKI STANG ZIEHL & JONES LLP
150 California Street, 15th Floor
San Francisco, California 94111
Telephone:    415.263.7000
Facsimile:    415.263.7010
Email:        jpomerantz@pszjlaw.com
              dgrassgreen@pszjlaw.com
              jlucas@pszjlaw.com
              mpagay@pszjlaw.com

Attorneys for Debtors

Maureen A. Sheehy (State Bar No. 129859)
Tali L. Alban (State Bar No. 233964)
KILPATRICK TOWNSEND & STOCKTON LLP
Two Embarcadero Center, 8th Floor
San Francisco, California  94111
Telephone:  (415) 576-0200
Facsimile:  (415) 576-0300
Email:    tlalban@kilpatricktownsend.com
          msheehy@kilpatricktownsend.com

Todd C. Meyers (Admitted *pro hac vice*)
Paul M. Rosenblatt (Admitted *pro hac vice*)
1100 Peachtree Street, Suite 2800
Atlanta, Georgia  30309-4530
Telephone: (404) 815-6500
Facsimile: (404) 815-6555
E-mail:   tmeyers@kilpatricktownsend.com
          prosenblatt@kilpatricktownsend.com

Attorneys for Jackson Investment Group, LLC

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| In re:<br><br>BLUE EARTH, INC., et al.,[1]<br><br>            Debtors. | Case No.:  16-30296 DM<br><br>Chapter 11<br>Jointly Administered<br><br>**DISCLOSURE STATEMENT IN SUPPORT OF JOINT PLAN OF REORGANIZATION OF THE DEBTORS PROPOSED BY THE DEBTORS AND JACKSON INVESTMENT GROUP, LLC**<br><br>**Disclosure Statement Approval Hearing:**<br>Date:    June 10, 2016<br>Time:    11:30 a.m.<br><br>**Plan Confirmation Hearing:**<br>Date:<br>Time:<br>Place:    United States Bankruptcy Court<br>       450 Gold Gate Avenue, 16th Floor<br>       Courtroom 17<br>       San Francisco, California 94102<br>Judge:   Honorable Dennis Montali |

[1] The last four digits of each of the Debtors' tax identification numbers are Blue Earth, Inc. (1496) and Blue Earth Tech, Inc. (0269).  The location of the Debtors' headquarters and service address is 235 Pine Street, Suite 1100, San Francisco, California 94104.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

# TABLE OF CONTENTS

**Page(s)**

I.  INTRODUCTION ...........................................................................................................1

    A.    Introduction .......................................................................................... 1

    B.    Information Regarding the Plan ............................................................ 2

        1.    Plan Governing Document ........................................................2

        2.    Source of Information ...............................................................2

        3.    Bankruptcy Court Approval ......................................................3

    C.    Voting Instructions ............................................................................... 3

        1.    How to Vote .............................................................................3

        2.    Who May Vote .........................................................................4

    D.    Confirmation ........................................................................................ 5

    E.    Disclaimers .......................................................................................... 7

II.  PLAN OVERVIEW .....................................................................................................8

    A.    Introduction .......................................................................................... 8

    B.    Treatment of Claims ............................................................................ 9

        1.    Classification Generally ...........................................................9

        2.    Unclassified Claims .................................................................9

        3.    Classified Claims .....................................................................9

        4.    Chart Describing Treatment of Claims ....................................10

    C.    Other Plan Provisions ........................................................................ 17

        1.    Means for Implementation of the Plan; Litigation Trust ........17

        2.    Exit Contingent Note ..............................................................17

        3.    Sources of Cash for Plan Distributions ...................................17

        4.    Directors and Officers of the Reorganized Debtors.................18

        5.    Preservation of Causes of Action/Releases..............................18

        6.    Executory Contracts and Leases ..............................................19

        7.    Allowed, Disputed or Unliquidated Claims .............................19

        8.    Conditions to the Effective Date ..............................................19

        9.    Non-Consensual Confirmation ................................................19

        10.    Effect of Confirmation ............................................................19

        11.    Retention of Jurisdiction .........................................................20

III.  OVERVIEW OF THE CHAPTER 11 CASES ..........................................................20

    A.    Events Leading Up to the Filing of the Chapter 11 Cases .................. 20

        1.    Overview of the Debtor's Business ..........................................20

        2.    Corporate Organization and Ownership ..................................22

i

Case: 16-30296   Doc# 131   Filed: 05/06/16   Entered: 05/06/16 18:02:57   Page 2 of 78

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

|  |  |  |  |
|---|---|---|---|
| B. | | Summary of Prepetition Debt | 25 |
| | 1. | Jackson Investment Group LLC | 25 |
| | 2. | TCA Global Credit Master Fund LP | 27 |
| | 3. | Laird Q. Cagan | 28 |
| C. | | Incomplete EnSite "Spinoff" | 28 |
| D. | | Events Leading to Chapter 11 Filing | 29 |
| E. | | Prepetition Litigation | 30 |
| | 1. | Blue Earth, Inc. Securities Litigation | 30 |
| | 2. | Derivative Lawsuit | 31 |
| F. | | SEC Staff Review and Investigation | 31 |
| G. | | Postpetition Events | 32 |
| | 1. | "First Day" Motions | 32 |
| | 2. | Employment of Professionals | 34 |
| | 3. | DIP Financing | 36 |
| | 4. | Motion for Relief from Stay Re: D&O Insurance Policies | 37 |
| H. | | The Claims Bar Date | 38 |
| IV. | ADDITIONAL INFORMATION RELEVANT TO THE PLAN | | 38 |
| A. | | The Debtors' Assets and Liabilities | 38 |
| B. | | EnSite Post-Effective Date Equity Raise | 39 |
| C. | | SEC Filings | 41 |
| V. | CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES | | 41 |
| A. | | Introduction | 41 |
| B. | | Federal Income Tax Consequences to the Debtor | 43 |
| | 1. | COD Income and Attribute Reduction | 43 |
| | 2. | Treatment of Any Remaining NOLs; Section 382 | 44 |
| C. | | Federal Income Tax Consequences to Holders of Claims | 45 |
| | 1. | General | 45 |
| | 2. | Possible Treatment as Tax-Free Recapitalization | 45 |
| | 3. | Character of Gain or Loss; Loss Limitations | 46 |
| | 4. | Amounts Received in Respect of Accrued But Unpaid Interest | 46 |
| | 5. | Treatment of the Litigation Trust | 47 |
| | 6. | Information Reporting and Backup Withholding | 48 |
| VI. | LIQUIDATION ANALYSIS | | 48 |
| VII. | RISK ANALYSIS | | 50 |
| A. | | Allowed Claims May Exceed Good Faith Estimates | 50 |
| B. | | Plan May Not Be Confirmed | 51 |
| C. | | Recoveries Are Contingent on Certain Factors | 51 |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

ii

    D.       Government Investigations ........................................................... 51

VIII.  FEASIBILITY ..................................................................................51

IX.  CONFIRMATION OF THE PLAN ................................................52

X.  RECOMMENDATION AND CONCLUSION ..............................53

**Statutes**

11 U.S.C. § 1125 ......................................................................................... 7

Case: 16-30296   Doc# 131   Filed: 05/06/16   Entered: 05/06/16 18:02:57   Page 4 of 78

**Disclosure Statement Exhibits**

Exhibit 1                Plan

Exhibit 2                Post Confirmation Budget

Exhibit 3                Liquidation Analysis

Exhibit 4                Corporate Organizational Chart


**Plan/Plan Supplement Exhibits**[2]

Exhibit A                Articles of Incorporation for Reorganized Blue Earth

Exhibit B                List of Assumed Executory Contracts and Unexpired Leases

Exhibit C                Principal Exit Contingent Note Documents

Exhibit D                List of Trust Causes of Action

Exhibit E                Litigation Trust Agreement

Exhibit F                List of officers for Reorganized Blue Earth

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

---

[2] The Exhibits not initially appended to the Plan will be filed as part of the Plan Supplement. All Exhibits will be made available, free of charge, on the Document Website at **http://www.kccllc.net/blueearth** once they are filed. Copies of all Exhibits may be obtained from Debtors' counsel. The Plan Proponents reserve the right to modify, amend, supplement, restate or withdraw any of the Exhibits after they are filed and shall promptly make such changes available on the Document Website.

Case: 16-30296   Doc# 131   Filed: 05/06/16   Entered: 05/06/16 18:02:57   Page 5 of 78

# I.

## INTRODUCTION

**A.    Introduction**

Blue Earth, Inc. ("**Blue Earth**") and Blue Earth Tech, Inc. ("**BE Tech**" and, collectively with Blue Earth, the "**Debtors**"), as debtors and debtors in possession, along with Jackson Investment Group, LLC ("**JIG**"), proposed their joint plan of reorganization for the resolution of Claims against and Interests in each of the Debtors pursuant to chapter 11 of the Bankruptcy Code on May 6, 2016. The Debtors and JIG are the proponents of the Plan within the meaning of section 1129 of the Bankruptcy Code.

This Disclosure Statement is being distributed contemporaneously with the Plan and contains a discussion of the Debtors' assets, liabilities, history, business, results of operations, historical financial information, projections of future operations and a summary of the Plan and the distributions to be made thereunder.

The Plan is attached hereto as **Exhibit "1"**. Defined terms not otherwise defined herein have the same meanings as set forth in the Plan. Other agreements and documents supplementing the Plan are appended as Exhibits hereto or to the Plan and have been or will be filed with the Bankruptcy Court. These supplemental agreements and documents are referenced in the Plan and the Disclosure Statement and will be available for review.

ALL CREDITORS ENTITLED TO VOTE ON THE PLAN ARE ENCOURAGED TO READ THIS DISCLOSURE STATEMENT IN ITS ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. SUBJECT TO CERTAIN RESTRICTIONS AND REQUIREMENTS SET FORTH IN SECTION 1127 OF THE BANKRUPTCY CODE, IN BANKRUPTCY RULE 3019 AND IN THE PLAN, THE PLAN PROPONENTS RESERVE THE RIGHT TO ALTER, AMEND, MODIFY, REVOKE OR WITHDRAW THE PLAN PRIOR TO ITS SUBSTANTIAL CONSUMMATION.

**THE PLAN PROPONENTS BELIEVE THAT THE IMPLEMENTATION OF THE PLAN IS IN THE BEST INTERESTS OF EACH OF THE DEBTORS AND THEIR STAKEHOLDERS. FOR ALL OF THE REASONS DESCRIBED IN THIS DISCLOSURE**

1

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

STATEMENT, THE PLAN PROPONENTS URGE YOU TO RETURN YOUR BALLOT ACCEPTING THE PLAN BY THE VOTING DEADLINE (I.E., THE DATE BY WHICH YOUR BALLOT MUST BE ACTUALLY RECEIVED), WHICH IS [_____ ___,] 2016, AT 5:00 P.M. (PACIFIC TIME).

UNDER THE PLAN, GENERAL UNSECURED CREDITORS WILL RECEIVE EITHER (1) A GUARANTEED DIVIDEND OF 5% ON ACCOUNT OF ALLOWED CLAIMS, WITH THE OPPORTUNITY TO RECOVER UP TO 100% PLUS INTEREST, FROM THE LITIGATION TRUST OR (2) A GUARANTEED DISTRIBUTION EQUAL TO 30% OF THEIR ALLOWED CLAIMS. *ALTERNATIVELY, BASED ON THE LIQUIDATION ANALYSIS ATTACHED HERETO, THE PLAN PROPONENTS BELIEVE THAT IF THE DEBTORS WERE LIQUIDATED UNDER CHAPTER 7, HOLDERS OF GENERAL UNSECURED CLAIMS WOULD RECEIVE NO DISTRIBUTIONS EXCEPT FROM LITIGATION RECOVERIES IN THE FUTURE.*

**B.**     **Information Regarding the Plan**

**1.**     **Plan Governing Document**

Although the Plan Proponents believe that this Disclosure Statement accurately describes the Plan, all summaries of the Plan contained in this Disclosure Statement are qualified by the Plan itself and the documents described therein which are controlling.  You are urged to read the Plan in its entirety and not just this Disclosure Statement.

**2.**     **Source of Information**

Factual information, including all financial information contained in this Disclosure Statement, has been provided by the Debtors, JIG, or their respective professionals, or has been obtained from the Debtors' or JIG's records, except where otherwise specifically noted.  None of the Plan Proponents' attorneys, accountants or other professionals makes any representation regarding that information.  The Plan Proponents do not represent or warrant that the information contained in this Disclosure Statement is free from any inaccuracy.  The Plan Proponents have, however, attempted to present the information accurately and fairly, and the Plan Proponents believe that the information is substantially accurate.  The assumptions underlying the projections contained in this

2

Disclosure Statement concerning the sources and amounts of payments to creditors and Interest Holders represent the Plan Proponents' best estimate as to what they expect will happen. Because they are only assumptions about or predictions of future events, many of which are beyond the Plan Proponents' control, there can be no assurances that the assumptions will in fact materialize or that the projected realizations will in fact be met. Except as otherwise provided herein, this Disclosure Statement will not reflect any events that occurred after the hearing before the Bankruptcy Court to determine the adequacy of the Disclosure Statement.

### 3. Bankruptcy Court Approval

[Following a hearing held on June 10, 2016, the Bankruptcy Court approved this Disclosure Statement as containing information of a kind and in sufficient detail adequate to enable a hypothetical, reasonable investor to make an informed judgment about the Plan.] Under section 1125 of the Bankruptcy Code, this approval enabled the Plan Proponents to send you this Disclosure Statement and solicit your acceptance of the Plan. The Bankruptcy Court has not, however, approved the Plan itself, nor conducted a detailed investigation into the contents of this Disclosure Statement.

## C. Voting Instructions

### 1. How to Vote

A Ballot is enclosed herewith for creditors entitled to vote to accept or reject the Plan. To vote on the Plan, indicate on the enclosed Ballot that you accept or you reject the Plan and sign your name and mail the Ballot in the envelope provided for this purpose.

**To be counted, Ballots must be completed, signed and returned so that they are actually received no later than the Voting Deadline (i.e., [_____ ___, 2016 at 5:00 p.m. (Pacific Time)]) at the following address:**

Blue Earth Ballot Processing
c/o John W. Lucas
PACHULSKI STANG ZIEHL & JONES LLP
150 California Street, 15th Floor
San Francisco, California 94111

**Do not send your Ballot via facsimile or e-mail.**

3

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

If your Ballot is not properly completed, signed and returned as described, it will not be counted. If your Ballot is damaged or lost, you may request a replacement by sending a written request to the above address.

**2.     Who May Vote**

Claims against and Interests in the Debtors are classified in up to nine (9) separate Classes, with subclasses for each of the two Debtors – Blue Earth and BE Tech. The following table designates the Classes of Claims against and Interests in the Debtors and specifies which Classes are (a) Impaired or Unimpaired by the Plan, (b) entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code or (c) deemed to accept or reject the Plan.

| Class | Designation | Impairment | Entitled to Vote |
|-------|-------------|------------|------------------|
| Class 1A | Priority Claims – Blue Earth | Unimpaired | Deemed to Accept |
| Class 1B | Priority Claims – BE Tech | Unimpaired | Deemed to Accept |
| Class 2A | Other Secured Claims – Blue Earth | Unimpaired | Deemed to Accept |
| Class 2B | Other Secured Claims – BE Tech | Unimpaired | Deemed to Accept |
| Class 3A | Prepetition Note Secured Claims – Blue Earth | Impaired | Entitled to Vote |
| Class 3B | Prepetition Note Secured Claims – BE Tech | Impaired | Entitled to Vote |
| Class 4A | General Unsecured Claims – Blue Earth | Impaired | Entitled to Vote |
| Class 4B | General Unsecured Claims – BE Tech | Impaired | Entitled to Vote |
| Class 5A | D&O Claims – Blue Earth | Impaired | Entitled to Vote |
| Class 5B | D&O Claims – BE Tech | Impaired | Entitled to Vote |
| Class 6A | Section 510 Claims – Blue Earth | Impaired | Deemed to Reject |
| Class 7A | Intercompany Claims – Blue Earth | Unimpaired | Deemed to Accept |
| Class 7B | Intercompany Claims – BE Tech | Unimpaired | Deemed to Accept |
| Class 8A | Equity Interests – Blue Earth | Impaired | Deemed to Reject |
| Class 9B | Equity Interests – BE Tech | Unimpaired | Deemed to Accept |

Classes of creditors that are Impaired by the Plan are entitled to vote or may be deemed to have rejected the Plan. Each Holder of an Allowed Claim in an Impaired Class that will receive distributions under the Plan on account of such Claims may vote to accept or reject the Plan. A Class is Impaired if the legal, equitable or contractual rights attaching to the Claims or Interests of the Class are modified, other than by curing defaults and reinstating maturities.

**Classes 1A, 1B, 2A, 2B, 7A, 7B and 9B are Unimpaired and deemed to have accepted the Plan. Classes 3A, 3B, 4A, 4B, 5A, 5B and 8A are Impaired under the Plan; however only**

4

**Classes 3A, 3B, 4A, 4B, 5A and 5B are entitled to vote on the Plan because Classes 6A and 8A are deemed to have rejected the Plan.**

In determining acceptances of the Plan, the vote of a creditor will only be counted if submitted by a creditor whose Claim is an Allowed Claim. Generally speaking, a creditor holds an Allowed Claim if such Claim is duly scheduled by the Debtors as other than disputed, contingent or unliquidated, or the creditor has timely filed with the Bankruptcy Court a Proof of Claim which has not been objected to or disallowed prior to computation of the votes on the Plan. The Ballot form that you received does <u>not</u> constitute a Proof of Claim.

**D.      Confirmation**

"Confirmation" is the technical phrase for the Bankruptcy Court's approval of a plan of reorganization. At the Confirmation Hearing, in order to confirm the Plan, the Plan Proponents must demonstrate that the Plan has met the requirements of section 1129 of the Bankruptcy Code. If the Bankruptcy Court determines that all of the requirements of section 1129 have been satisfied, the Bankruptcy Court will enter an order confirming the Plan. The Plan Proponents believe that the Plan satisfies all the statutory requirements of chapter 11 of the Bankruptcy Code for Confirmation of the Plan.

Voting is tabulated by class. As discussed above, a class of creditors or interest holders has accepted a plan of reorganization if the plan has been accepted by two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of creditors or interest holders holding allowed claims or interests in that class who actually vote to accept or reject such plan.

Even if a class of creditors or interests votes against a plan of reorganization, the plan may nevertheless be confirmed by the bankruptcy court, notwithstanding the rejection of the plan by such class, so long as certain statutory requirements are met by the plan. This procedure is called a "cram down." The Plan Proponents will request that the Bankruptcy Court confirm the Plan in accordance with section 1129(b) of the Bankruptcy Code if any Class rejects the Plan.

The Bankruptcy Court has set [_____, 2016 at __:__ __.m. (Pacific Time)] as the hearing date to determine whether the Plan has been accepted by the requisite number of creditors and whether the other requirements for Confirmation of the Plan have been satisfied. The

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

5

DOCS_LA:298397.7

hearing regarding Confirmation will be held at the United States Bankruptcy Court, 450 Golden Gate Avenue, 18th Floor, San Francisco, California 94104. This hearing may be continued from time to time and day to day without further notice. If the Bankruptcy Court confirms the Plan, it will enter the Confirmation Order. Any objections to Confirmation of the Plan must (1) be in writing, (2) state the name and address of the objecting party and the nature of the Claim or Interest of such party, and (3) state with particularity the basis and nature of such objection. Any such objections must be filed with the Clerk of the Bankruptcy Court and served on the parties set forth below on or before the date set forth in the Notice of Confirmation Hearing sent to you with this Disclosure Statement and the Plan.

Objections must be timely served upon:

          (1) The Debtors:

          Blue Earth, Inc.
          Blue Earth Tech, Inc.
          235 Pine Street, Suite 1100
          San Francisco, California 94104
          Attn: G. Robert Powell
          Telephone:    (415) 964-4411
          Email:        bob@blueearthinc.com

          (2) Counsel for the Debtors:

          Jeffrey N. Pomerantz
          Debra I. Grassgreen
          John W. Lucas
          Malhar S. Pagay
          Pachulski Stang Ziehl & Jones LLP
          150 California Street, 15th Floor
          San Francisco, California 94111
          Telephone:    (415) 263-7000
          Email:        jpomerantz@pszjlaw.com
                          dgrassgreen@pszjlaw.com
                          jlucas@pszjlaw.com
                          mpagay@pszjlaw.com

          (3) Counsel for the Creditors' Committee:

          Donald W. Fitzgerald
          Thomas A. Willoughby
          Jennifer E. Niemann
          Felderstein Fitzgerald Willoughby & Pascuzzi LLP
          400 Capitol Mall, Suite 1750
          Sacramento, California 95814
          Telephone:    (916) 329-7400
          Email:        twilloughby@ffwplaw.com

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

6

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

(4) Counsel for JIG:

Todd C. Meyers
Paul M. Rosenblatt
Kilpatrick Townsend & Stockton LLP
1100 Peachtree Street, NE, Suite 2800
Atlanta, Georgia 30309-4530
Telephone:    (404) 815-6500
Email:        tmeyers@kilpatricktownsend.com
              prosenblatt@kilpatricktownsend.com

and

(5) The Office of the United States Trustee

Lynette C. Kelly
Trial Attorney
Office of the United States Trustee
1301 Clay Street, Suite 690N
Oakland, California 94612
Telephone:    (510) 637-3200
Email:        lynette.c.kelly@usdoj.com

## E.    Disclaimers

THIS DISCLOSURE STATEMENT CONTAINS INFORMATION WHICH MAY BEAR UPON YOUR DECISION TO ACCEPT OR REJECT THE PROPOSED PLAN.  PLEASE READ THIS DOCUMENT WITH CARE.  THE PURPOSE OF THIS DISCLOSURE STATEMENT IS TO PROVIDE "ADEQUATE INFORMATION" OF A KIND, AND IN SUFFICIENT DETAIL, AS FAR AS IS REASONABLY PRACTICABLE IN LIGHT OF THE NATURE AND HISTORY OF THE DEBTORS AND THE CONDITION OF THE DEBTORS' BOOKS AND RECORDS, THAT WOULD ENABLE A HYPOTHETICAL REASONABLE INVESTOR TYPICAL OF HOLDERS OF CLAIMS OR INTERESTS OF THE RELEVANT CLASS TO MAKE AN INFORMED JUDGMENT CONCERNING THE PLAN.  *SEE* 11 U.S.C.  § 1125(a).

FOR THE CONVENIENCE OF CREDITORS AND INTEREST HOLDERS, THIS DISCLOSURE STATEMENT SUMMARIZES THE TERMS OF THE PLAN, BUT THE PLAN ITSELF QUALIFIES ANY SUMMARY.  *IF ANY INCONSISTENCY EXISTS BETWEEN THE PLAN AND THIS DISCLOSURE STATEMENT, THE TERMS OF THE PLAN WILL CONTROL*.

DOCS_LA:298307.7

THE CONTENTS OF THIS DISCLOSURE STATEMENT SHOULD NOT BE CONSTRUED AS LEGAL, BUSINESS OR TAX ADVICE.  EACH CREDITOR OR INTEREST HOLDER SHOULD CONSULT HIS OR HER OWN LEGAL COUNSEL AND ACCOUNTANT AS TO LEGAL, TAX AND OTHER MATTERS CONCERNING HIS OR HER CLAIM OR INTEREST.

## II.

## **PLAN OVERVIEW**

A discussion of the principal provisions of the Plan as they relate to the treatment of Classes of Allowed Claims is set forth below.  The discussion of the Plan that follows constitutes a summary only and should not be relied upon for voting purposes.  You are urged to read the Plan in full in evaluating whether to accept or reject the Plan proposed by the Plan Proponents.  If any inconsistency exists between this summary and the Plan, the terms of the Plan shall control.  A complete copy of the Plan is attached hereto as **Exhibit "1"**.

**A.**     **Introduction**

The Plan generally provides for a reorganization of the Debtors' business through a debt-for-equity swap whereby JIG, the Debtors' Prepetition Secured Lender and DIP Lender, shall receive 100% of the Reorganized Blue Earth Equity Interests.  Therefore, upon the Effective Date, JIG will become the 100% owner of Reorganized Blue Earth. Interests in Reorganized BE Tech will be Reinstated.  More specifically, Reorganized Blue Earth will assume $8 million of debt into the Exit Contingent Note, from a combination of the full amount of the Plan Funding Amount, a substantial portion of the Allowed DIP Claim and a portion of the Allowed Prepetition Note Secured Claim, and convert $1 million from a combination of a portion of the Allowed DIP Claim and a portion of the Allowed Prepetition Note Secured Claim into Reorganized Blue Earth Equity Interests.  Reorganized Blue Earth will retain the operations of Sumter Heat and Power, LLC, as well as collect various other receivables.  The Exit Contingent Note will have a term of 5 years, deferred interest accruing at 1%, and after 5 years any remaining amount of the Exit Contingent Note will be satisfied in full from the assets of Reorganized Blue Earth.

Case: 16-30296     Doc# 131     Filed: 05/06/16     Entered: 05/06/16 18:02:57     Page 13 of 78

Shortly after the Effective Date, Brooks Heat & Power, Ltd., will be transferred to a separate newly formed entity owned by JIG, and upon such transfer, the Exit Contingent Note will be reduced by $2,400,000. The newly formed entity will provide management services to the Reorganized Debtors, and the Reorganized Debtors will have no direct employees. It is anticipated that EnSite Power, Inc., will be able to raise capital from third parties after the Effective Date.

**B.      Treatment of Claims**

**1.      Classification Generally**

The Claims and Interests listed below are classified pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.

A Claim or Interest shall be deemed classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and shall be deemed classified in a different Class only to the extent that any portion of such Claim or Interest qualifies within the description of such different Class. A Claim or Interest is placed in a particular Class only to the extent that such Claim or Interest is Allowed in that Class and has not been paid, released, or otherwise settled prior to the Effective Date. Notwithstanding any distribution provided for in the Plan, no distribution on account of any Claim or Interest is required or permitted unless and until such Claim or Interest becomes an Allowed Claim or Allowed Interest, as the case may be, which might not occur, if at all, until after the Effective Date.

**2.      Unclassified Claims**

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Fee Claims, DIP Claims, and Priority Tax Claims have not been classified and are excluded from the Classes of Claims set forth in Section II.C. of the Plan. Section II. A. of the Plan governs the treatment and payment of all such unclassified Claims.

**3.      Classified Claims**

The Plan divides the Claims against and Interests in the Debtors into nine (9) separate Classes (with subclasses for each Debtor's case) and identifies which Classes are entitled to vote on the Plan. All of the potential Classes are set forth in Sections II.B. and C. therein.

9

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

**4. Chart Describing Treatment of Claims**

The following table designates Unclassified Claims, the Classes of Claims against and Interests in the Debtors, and specifies which Classes are (a) Impaired or Unimpaired by the Plan, (b) entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code, or (c) deemed to accept or reject the Plan. Recovery amounts listed below are estimated

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

10

| TREATMENT OF CLAIMS CHART | | | |
|---|---|---|---|
| **Class** | **Description** | **Estimate of Claims and Recoveries** | **Plan Treatment** |
| N/A | Allowed Administrative Claims | Estimated Recovery on Allowed Claims in this category: 100% | Except as specified in Section II.A.1 of the Plan, and subject to Section II.A.1.f of the Plan and subject to the bar date provisions therein, unless otherwise agreed by the Holder of an Administrative Claim and the Plan Proponents, each Holder of an Allowed Administrative Claim shall receive, in full satisfaction of its Administrative Claim, Cash equal to the Allowed amount of such Administrative Claim on either (i) the latest to occur of (A) the Effective Date (or as soon thereafter as practicable), (B) the date such Claim becomes an Allowed Administrative Claim, and (C) such other date as may be agreed upon by the Plan Proponents and the Holder of such Administrative Claim or (ii) on such other date as the Bankruptcy Court may order. <br><br> Administrative Claims based on liabilities incurred by a Debtor in the ordinary course of its business on or after the Petition Date, including Administrative Claims arising from or with respect to the sale of goods or provision of services on or after the Petition Date, Administrative Claims of governmental units for Taxes (including Tax Claims related to Tax years or portions thereof ending after the Petition Date), Administrative Claims arising under Executory Contracts and Unexpired Leases, shall be paid by the applicable Reorganized Debtor, pursuant to the terms and conditions of the particular transaction giving rise to those Administrative Claims, without further action by the Holders of such Administrative Claims or further approval by the Bankruptcy Court. Holders of the foregoing Administrative Claims shall not be required to File or serve any request for payment of such Administrative Claims.  Plan, § II.A.1. |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

| | | TREATMENT OF CLAIMS CHART | |
|---|---|---|---|
| **Class** | **Description** | **Estimate of Claims and Recoveries** | **Plan Treatment** |
| N/A | Allowed Priority Tax Claims | Estimated Recovery on Allowed Claims in this category: 100% | Pursuant to section 1129(a)(9)(C) of the Bankruptcy Code, unless otherwise agreed by the Holder of a Priority Tax Claim and the Plan Proponents, each Holder of an Allowed Priority Tax Claim shall receive, at the option of the Plan Proponents, in full satisfaction of its Allowed Priority Tax Claim that is due and payable on or before the Effective Date, on account of and in full and complete settlement, release and discharge of such Claim, (i) Cash in an amount equal to the amount of such Allowed Priority Tax Claim or (ii) Cash in an aggregate amount of such Allowed Priority Tax Claim payable in installment payments over a period of time not to exceed five years after the Petition Date, pursuant to section 1129(a)(9)(C) of the Bankruptcy Code; provided, however, that all Allowed Priority Tax Claims that are not due and payable on or before the Effective Date shall be paid in the ordinary course of business by the Reorganized Debtors as they become due; provided, further, that, in the event an Allowed Priority Tax Claim is also a Secured Tax Claim, such Claim shall, to the extent it is Allowed, be treated as an Other Secured Claim if such Claim is not otherwise paid in full.<br><br>Notwithstanding Section II.A.2.a of the Plan, any Claim on account of any penalty arising with respect to or in connection with an Allowed Priority Tax Claim that does not compensate the Holder for actual pecuniary loss shall be treated as a General Unsecured Claim, and the Holder (other than as the Holder of a General Unsecured Claim) may not assess or attempt to collect such penalty from the Reorganized Debtors or their respective property.  Plan, § II.A.2. |

DOCS_LA:298397.7

Case: 16-30296    Doc# 131    Filed: 05/06/16    Entered: 05/06/16 18:02:57    Page 17 of 78

| TREATMENT OF CLAIMS CHART | | | |
|---|---|---|---|
| **Class** | **Description** | **Estimate of Claims and Recoveries** | **Plan Treatment** |
| 1A, 1B | Priority Claims | Estimated Recovery on Allowed Claims in this Class: 100%<br><br>**UNIMPAIRED**<br><br>**NOT ENTITLED TO VOTE** | On the later of (x) the Effective Date and (y) the date on which such Priority Claim becomes an Allowed Priority Claim, unless otherwise agreed to by the Plan Proponents and the Holder of an Allowed Priority Claim, each Holder of an Allowed Priority Claim against a Debtor shall receive on account and in full and complete settlement, release and discharge of such Claim, at the Debtors' election, Cash in the amount of such Allowed Priority Claim in accordance with section 1129(a)(9) of the Bankruptcy Code. All Allowed Priority Claims against the Debtors that are not due and payable on or before the Effective Date shall be paid by the Reorganized Debtors when such Claims become due and payable in the ordinary course of business in accordance with the terms thereof. Plan, § II.C.1. |
| 2A, 2B | Other Secured Claims | Estimated Recovery on Allowed Claims in this Class: 100%<br><br>**UNIMPAIRED**<br><br>**NOT ENTITLED TO VOTE** | Unless otherwise agreed by the Holder of an Other Secured Claim and the Plan Proponents, on the Effective Date or as soon as reasonably practicable thereafter, each Holder of an Other Secured Claim shall receive the following treatment at the option of the Debtors: (i) such Allowed Other Secured Claim shall be Reinstated; (ii) payment in full (in Cash) of any such Allowed Other Secured Claim; (iii) satisfaction of any such Allowed Other Secured Claim by delivering the collateral securing any such Allowed Other Secured Claim and paying any interest required to be paid under section 506(b) of the Bankruptcy Code; or (iv) such other recovery necessary to satisfy section 1129 of the Bankruptcy Code. Plan, § II.C.2. |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

13

| TREATMENT OF CLAIMS CHART | | | |
|---|---|---|---|
| **Class** | **Description** | **Estimate of Claims and Recoveries** | **Plan Treatment** |
| 3A, 3B | Prepetition Note Secured Claims | Estimated Recovery on Allowed Claims in this Class: 100% <br><br> **IMPAIRED** <br><br> **ENTITLED TO VOTE** | Unless otherwise agreed by JIG and the Debtors as to treatment that is no more favorable to JIG than what is provided in this Class 3, on the Effective Date or as soon as reasonably practicable thereafter, and subject to the terms of the Plan, in full and final satisfaction, settlement, release and discharge of, and in exchange for the Prepetition Note Secured Claim, the Prepetition Note Claim shall be Allowed, and JIG shall receive the following treatment: (i) Reorganized Blue Earth Equity Interests such that when combined with the conversion, if any, of the Allowed DIP Claim into Reorganized Blue Earth Equity Interests, JIG receives 100% of the Reorganized Blue Earth Equity Interests in an aggregate value of $1 million; (ii) assumption of an amount of the Allowed Prepetition Note Secured Claim into an equal amount of the Exit Contingent Note, such that the amount assumed will be the difference between (x) $8 million and (y) the amounts of the Allowed DIP Claim and Plan Funding Amount assumed into the Exit Contingent Note; and (iii) the balance after clauses (i) and (ii) above of the Prepetition Note Secured Claim shall be the amount of the Allowed JIG Deficiency Claim. Plan, § II.C.3. |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

14

| TREATMENT OF CLAIMS CHART | | | |
|---|---|---|---|
| **Class** | **Description** | **Estimate of Claims and Recoveries** | **Plan Treatment** |
| 4A, 4B | General Unsecured Claims | Estimated Recovery on Allowed Claims in this Class:<br>Option 1: 30% upon allowance<br><br>or<br><br>Option 2: 5% upon allowance and up to 100% plus interest, only from distributions from Litigation Trust<br><br>**IMPAIRED**<br><br>**ENTITLED TO VOTE** | Unless otherwise agreed by the Holder of a General Unsecured Claim and the Plan Proponents, each Holder of an Allowed General Unsecured Claim in Class 4 shall receive either: OPTION 1 – a one-time payment in an amount of Cash equal to thirty percent (30%) of such Holder's Allowed General Unsecured Claim following the later of the Claims Objection Deadline and the date such General Unsecured Claim becomes Allowed; or OPTION 2 – a one-time payment in an amount of Cash equal to five percent (5%) of such Holder's Allowed General Unsecured Claim following the later of the Claims Objection Deadline and the date such General Unsecured Claim becomes Allowed, plus such Holder's Pro Rata share of the Litigation Trust Assets including interest at the Federal Interest Rate accruing from and after the Effective Date. At any time prior to such Holder receiving 100% of such Holder's Allowed General Unsecured Claim plus interest, Reorganized Blue Earth may, at its option, make a one-time payment to all Litigation Trust Beneficiaries of the Litigation Trust Assets in an amount of Cash equal to the difference between 100% of such Holder's Allowed General Unsecured Claim plus interest and the amount of distributions such Holder has already received under Option 2, such that each Litigation Trust Beneficiary receives 100% of such Holder's Allowed General Unsecured Claim plus interest at the Federal Interest Rate accruing from and after the Effective Date through and including the date such payment is made. Holders of General Unsecured Claims entitled to vote in Class 4 that timely vote may elect between Option 1 and Option 2 on their Ballot. All Holders of General Unsecured Claims that either fail to vote, or vote but fail to make a timely election, shall receive the treatment in Option 1..The Allowed JIG Deficiency Claim shall receive the treatment in Option 2. Plan, § II.C.4. |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

| | | | |
|---|---|---|---|
| **TREATMENT OF CLAIMS CHART** | | | |
| **Class** | **Description** | **Estimate of Claims and Recoveries** | **Plan Treatment** |
| 5A, 5B | D&O Claims | Estimated Recovery on Allowed Claims in this Class: (N/A)%<br><br>**IMPAIRED**<br><br>**ENTITLED TO VOTE** | In full satisfaction of Class 5A and 5B D&O Claims, the automatic stay and the discharge injunction, to the extent applicable, shall be lifted to allow the D&O Insurers to pay Defense Costs and any Loss (as such terms are defined in the D&O Policies) pursuant to the terms of the D&O Policies and the D&O Insurers' Obligations to the Individual Insureds (as such term is defined in the D&O Policies) under the D&O Policies; Holders of Class 5A and 5B D&O Claims shall not receive any payment from the Estate, Litigation Trust or the Reorganized Debtors on account of their D&O Claims.  Plan, § II.C.5. |
| 6A | Section 510 Claims | Estimated Recovery on Allowed Claims in this Class: 0%<br><br>**IMPAIRED**<br><br>**DEEMED TO REJECT** | No property shall be distributed to or retained by the Holders of Section 510 Claims, and such Claims shall be extinguished on the Effective Date. Holders of Section 510 Claims shall not receive any distribution pursuant to the Plan.  Plan, § II.C.6. |
| 7A, 7B | Intercompany Claims | Estimated Recovery on Allowed Claims in this Class: (N/A)%<br><br>**UNIMPAIRED**<br><br>**DEEMED TO ACCEPT** | On the Effective Date or as soon as reasonably practicable thereafter, all Intercompany Claims may be extinguished or compromised by distribution, contribution or otherwise, at the discretion of the Debtors or the Reorganized Debtors, as the case may be, on or after the Effective Date.  Plan, § II.C.7. |
| 8A | Blue Earth Interests | Estimated Recovery on Allowed Claims in this Class: 0%<br><br>**IMPAIRED**<br><br>**DEEMED TO REJECT** | On the Effective Date or as soon as reasonably practicable thereafter, all Blue Earth Interests shall be cancelled and extinguished.  Holders of Blue Earth Interests shall not receive any distribution pursuant to the Plan.  Plan, § II.C.8. |
| 9B | BE Tech Equity Interests | Estimated Recovery on Allowed Claims in this Class: (N/A) %<br><br>**UNIMPAIRED**<br><br>**DEEMED TO ACCEPT** | On the Effective Date, all BE Tech Equity Interests shall not receive any distribution pursuant to the Plan and shall be Reinstated, subject to Section III.C.1 of the Plan.  Plan, § II.C.9. |

16

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

**C.     Other Plan Provisions**

**1.     Means for Implementation of the Plan; Litigation Trust**

The Plan discusses how the Debtors' reorganization will be implemented, including the conversion of Blue Earth to a privately-held entity, the cancellation of existing equity Interests in Blue Earth and the distribution and issuance of new Interests in Reorganized Blue Earth to JIG. Plan, §§ III.A., C.  Holders of General Unsecured Claims may elect one of two treatment options for their Claims:  either a one-time Cash payment equal to thirty percent (30%) of the Allowed Claim amount or a five percent (5%) Cash payment plus a Pro Rata share of an interest in a Litigation Trust.  Plan, § II.C.4.

The Plan provides for the creation of a Litigation Trust for the purpose of investigating and prosecuting Trust Causes of Action that may result in distributions to Holders of Allowed General Unsecured Claims in Class 4A or 4B that properly elect treatment Option 2.  Plan, § III.G.  Bradley D. Sharp, Sr., a Managing Director of Development Specialists, Inc., has been asked by the Plan Proponents to act as the Litigation Trustee of the Litigation Trust.  Plan, § I.A.74.  The powers, rights and responsibilities of the Litigation Trustee will be specified in the Litigation Trust Agreement.

**2.     Exit Contingent Note**

The Plan describes Reorganized Blue Earth's assumption of $8 million of debt, first from the Allowed DIP Claim in the amount that is not converted to Reorganized Blue Earth Equity Interests, second from the full amount of the Plan Funding Amount, and third from a portion of the Allowed Prepetition Note Secured Claim as described in the Exit Contingent Note Documents.  Plan, §§ I.A.50., III.D.

**3.     Sources of Cash for Plan Distributions**

Distributions of Cash under the Plan shall come from the JIG in the form of the Plan Funding Amount, which will constitute the primary funding mechanism for the payment obligations under the Plan.  In addition, payment obligations under the Plan may be funded through a combination of one or more of the following:  (a)  Cash on hand of the Debtors, including Cash from business operations, or distributions from Non-Debtor Affiliates, (b) proceeds of any new equity

17

contributions, (c) the proceeds of tax refunds and Retained Causes of Action and (d) any other means of financing or funding that the Debtors or Reorganized Debtors determine is necessary or appropriate, subject to the terms of the Exit Contingent Note Documents. Holders of General Unsecured Claims electing treatment Option 2 in Class 4, may also receive subsequent distributions on account of their interest in the Litigation Trust. Plan, § III.E.

**4.      Directors and Officers of the Reorganized Debtors**

From and after the Effective Date, the initial officers of Reorganized Blue Earth shall be comprised of the individuals identified as **Exhibit "F"** to the Plan and Filed as part of the Plan Supplement. The New Board of Reorganized Blue Earth and Reorganized BE Tech shall initially consist of one (1) director for each board, Richard L. Jackson.

As of the date of the Plan, JIG has had discussions with G. Robert Powell, the Debtors' current Chief Executive Officer, regarding his employment following the Effective Date. The nature of compensation discussed was similar to Mr. Powell's current compensation, including base pay, a bonus and equity options. Plan, § III.F.2. While JIG has not had any specific discussions with Judith Hall regarding the terms and conditions of her employment after the Effective Date, it is anticipated, subject to agreeable employment terms being reached, that she will serve as Chief Legal Officer following the Effective Date.

**5.      Preservation of Causes of Action/Releases**

The Plan makes clear that all Causes of Action (other than those expressly waived, relinquished, released, compromised or settled in the Plan or any Final Order) are expressly reserved and either retained by the Reorganized Debtors (the Retained Causes of Action) or transferred to the Litigation Trust (the Trust Causes of Action). Plan, § III.H. The List of Trust Causes of Action may be found in Exhibit "D" to the Plan.

The Plan contains releases for JIG and its related parties and for two individuals who currently are involved with the management of the Debtors – G. Robert Powell and Judith Hall. The Creditors' Committee is investigating claims against JIG and the Debtors will conduct an independent analysis of any potential claims released against Powell and Hall, and will present evidence regarding the propriety of such releases in connection with Confirmation.

18

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

**6.     Executory Contracts and Leases**

The Plan contains provisions that govern the assumption or rejection of Executory Contracts and Unexpired Leases, including procedures for submitting unsecured claims arising from rejection damages and disputing amounts needed to "cure" Executory Contracts or Unexpired Leases to be assumed.  Plan, § IV.

**7.     Allowed, Disputed or Unliquidated Claims**

The Plan describes how Claims will be addressed after the Effective Date, including how the Reorganized Debtors and the Litigation Trustee will retain all defenses to such Claims held by the Debtors, the reservation of rights to object to any Disputed Claim and to estimate any unliquidated Claim.  Plan, § VI.

**8.     Conditions to the Effective Date**

The Plan will not become effective unless certain conditions have been satisfied or waived by the Plan Proponents, including, among others, entry of a Confirmation Order not subject to stay, the execution and delivery of all Exit Contingent Note Documents, New Securities and Documents and Litigation Trust, and the payment of all statutory fees and obligations then due to the Office of the United States Trustee.  Plan, § VII.B.

**9.     Non-Consensual Confirmation**

In the event that any Impaired Class of Claims or Interests rejects or is deemed to reject the Plan, the Plan Proponents reserve the right to request that the Bankruptcy Court nevertheless confirm the Plan in accordance with the so-called "cram down" provisions found in section 1129(b) of the Bankruptcy Code and/or amend the Plan.  Plan, § VIII.

**10.    Effect of Confirmation**

Confirmation of the Plan will impact significantly the rights of the Debtors, Holders of Claims and Interests and other parties in interest.  For example, as discussed in the Plan, Confirmation will result in (a) the dissolution of the Creditors' Committee; (b) the discharge of all Claims and Interests in exchange for the treatment afforded such Claims and Interests in the Plan; (c) the issuance of an injunction precluding all Holders of Claims or Interests and other parties in interest from taking any action against the Debtors, the Reorganized Debtors and other parties on

19

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

account of any such Liabilities; (d) the exculpation of the Debtors, Creditors' Committee, Prepetition Secured Lender, DIP Lender and their representatives with respect to matters arising during the Chapter 11 Cases, the Plan and related matters; and (e) the Debtors' release of G. Robert Powell (Blue Earth's Chief Executive Officer), Judith Hall (Blue Earth's Chief Legal Officer), the DIP Lender, Prepetition Secured Lender and their Representatives. Plan, § IX.

**11.    Retention of Jurisdiction**

The Plan provides that, after the Effective Date, the Bankruptcy Court will retain jurisdiction over a variety of matters enumerated in the Plan. Plan, § X.

<div align="center">

**III.**

**<u>OVERVIEW OF THE CHAPTER 11 CASES</u>**

</div>

This section of the Disclosure Statement discusses the significant events in the Chapter 11 Cases to date, including events leading up to the commencement of these Chapter 11 Cases. Copies of all relevant court papers are on File with the Bankruptcy Court and can be accessed free of charge at http://www.kccllc.net/blueearth/document/list/4240.

**A.    <u>Events Leading Up to the Filing of the Chapter 11 Cases</u>**

**1.    Overview of the Debtor's Business**

Blue Earth and its subsidiaries, is a provider of alternative/renewable energy solutions for small and medium-sized commercial and industrial facilities. Blue Earth builds, manages, owns and operates independent power generation and management systems geared towards helping commercial and industrial building owners save energy and money, and reduce their carbon footprint. Blue Earth solutions include Solar, Combined Heat and Power, Co-Generation, Control Systems and next-generation, environmentally friendly Battery Backup and Storage Systems.

As the company grew, Blue Earth expanded its comprehensive energy solutions offerings through strategic acquisitions of companies that had been providing energy solutions to an established customer base or developed a proprietary technology that can be utilized by customers to improve equipment reliability, reduce maintenance costs and provide a better overall operating environment. The primary strategic objective for the respective business units was to provide comprehensive energy solutions for building owners and occupants that combine Solar, Combined

<div align="center">20</div>

Heat and Power Generators, and Battery Storage into a single product that can reduce a building's utility derived energy usage and, therefore, its carbon footprint.

Historically, the acquired companies' operational activities were conducted through the following three business units: Blue Earth Solar ("**BE Solar**"); Blue Earth Combined Heat and Power ("**BE CHP**"); and EnSite Power. Blue Earth and its affiliates operated the following business divisions:

    a.    *BE Solar:*  BE Solar is the PhotoVoltaic (PV) division for engineering, procurement and construction (EPC) of distributed solar energy generation for commercial and industrial customers. Distributed Solar PV systems offer customers the benefit of producing their electricity needs onsite, thereby reducing their dependence on the power grid for their energy requirements. BE Solar builds, owns and operates the power plant or builds it for the customer to own. BE Solar has built and owned a 500,000 watt solar powered facility on the Island of Oahu, Hawaii, which it sold in 2014. BE Solar has also bought and sold the Lenape II solar project in Indianapolis, Indiana and is acting as the engineering, procurement and construction (EPC) contractor for the latter project. It has also built, operated and manages solar powered facilities in California. Services offered included the development, engineering, construction, operation and periodic warranty maintenance and, in certain cases, financing of small and medium scale alternative/renewable energy plants including solar photovoltaic (PV), Combined Heat and Power ("**CHP**") or on-site cogeneration. Currently, BE Solar is not active other than with respect to its contracts with SunValley Solar, Inc., relating to five PV installations in Southern California.

    b.    *BE CHP:*  BE CHP builds and operates combined heat and power plants for larger manufacturing and processing facilities. BE CHP designs, engineers, and constructs co-generation systems to match the thermal requirements of the host facility. BE CHP's business is premised on taking electricity produced in

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

1   excess of the facility requirements and then selling it back to the local power

2   utility. Customers sign long-term power and thermal purchase agreements to

3   fix costs.  BE CHP owns and operates the co-generation system and performs

4   all engineering and construction work at no cost to the host.  Currently, BE

5   CHP has one operational project in Sumter, South Carolina, and one project

6   under development in Brooks, Alberta (Canada).

7   c.   *EnSite:*  Through two of its subsidiaries, EnSite Power, Inc. ("**EnSite**") offers

8       battery backup technologies with Nickel-Zinc chemistry in addition to

9       hardware and software to monitor and control electro-mechanical equipment.

10      EnSite focuses on uninterruptible power supplies for Traffic and Data Center

11      industries, hardware and software to monitor and control electro-mechanical

12      systems for Building Energy Management Systems.

13  **2.      Corporate Organization and Ownership**

14  Blue Earth's sole executive officer is G. Robert Powell (Chief Executive Officer).

15  The company's Directors are:  Laird Q. Cagan (Chairman), G. Robert Powell, Robert C.

16  Potts, Michael W. Allman, James A. Kelly and Alan P. Krusi.

17  Blue Earth, a Nevada corporation, is a holding company that owns 100% of the outstanding

18  shares of thirteen direct subsidiaries and 72% of EnSite either engaged in the on-going business

19  activities of the company or having no current operations and, therefore, slated for dissolution.  Blue

20  Earth's stock has been publicly-traded on The Nasdaq Stock Market under the symbol

21  BBLU.  However, on September 15, 2015, Blue Earth received a letter from Nasdaq stating that the

22  bid price of the company's common stock for the prior 30 consecutive trading days had closed below

23  the minimum $1.00 per share required for continued listing.  On March 16, 2016, Blue Earth

24  received a staff determination letter from Nasdaq stating that it did not appear to Nasdaq that it is

25  possible for Blue Earth to cure the bid price deficiency required for continued listing.  Upon its

26  bankruptcy filing, Blue Earth was delisted under Nasdaq Listing Rules 5101, 5110(b), and IM 5101-

27  1, effective at the opening of business on March 28, 2016.  Blue Earth's common stock was

28  suspended and was thereby removed from listing and registration on The Nasdaq Stock Market.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

On April 8, 2016, Nasdaq filed Form 25 with the Securities and Exchange Commission to remove Blue Earth common stock from listing and/or registration under Section 12(b) of the Securities Exchange Act of 1934, effective on April 18, 2016.

Blue Earth's direct subsidiaries are:

    a.    Blue Earth Capital, Inc., a Nevada corporation, has no business operations or assets other than intercompany receivables;

    b.    Blue Earth CHP, Inc., a Utah corporation, operates the company's BE CHP business unit. It is the 100% owner of nine subsidiaries all of which relate to co-generation plants: Eight are Nevada limited liability companies (Live Oak Heat & Power, LLC; Marshalltown Heat & Power, LLC; Mt. Pleasant Heat & Power, LLC; Plainwell Heat & Power, LLC; Souderton Heat & Power LLC; Sumter Heat & Power, LLC ("**Sumter**"); Tolleson Heat & Power, LLC; and Worthington Heat & Power, LLC); one subsidiary, Brooks Heat & Power Ltd., is a British Columbia, Canada corporation ("**Brooks**"). None of the subsidiaries has a binding contract with a customer and, as such, has no value, with the exceptions of Sumter and Brooks. According to a "Business Enterprise Valuation of Blue Earth's CHP Facilities," dated as of April 18, 2016, prepared by EOS Capital Advisors LLC, the fair market values of the business assets of (a) Sumter are $750,000.00 (discounted cash flow value) and (b) Brooks are $2,000,000.00 (dissolution value), net of a mechanic's lien of approximately $1,600,000;[3]

    c.    Blue Earth Generator, Inc., a Nevada corporation, utilized experienced consultants, developers, engineers, service technicians and financial professionals to provide customers with services necessary in completing and running a successful power generation system. The company is based in New York and also leased property in New Jersey to store inventory and

---

[3] The value of Brooks represents a midpoint value in the range of $1,600,000 on the low end and $2,400,000 on the high end, net of the mechanic's lien.

23

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

1  equipment, to make repairs and conduct other maintenance activities.  The

2  company ceased operations, but continues to realize the benefits of existing

3  contracts that are cash flow positive.  The Debtors estimate the fair market

4  value of Blue Earth Generator, Inc., to be approximately $280,400, not

5  including costs of liquidating the company's assets, which are fully

6  encumbered by liens;

7  d.  Blue Earth Solar, Inc., a California corporation, operates the company's BE

8  Solar business unit.  It owns two subsidiaries:  Blue Earth Solar Oregon, LLC,

9  a Nevada limited liability company, and ecoLegacy Gas & Power, LLC, a

10  California limited liability company which has no current business operations.

11  The company has no valuable assets except for contracts with SunValley

12  Solar, Inc., relating to five PV installations in Southern California, which

13  result in stream of payment receivables collectible over the next three years in

14  the estimated amount of approximately $1.3 million after certain expenses;

15  e.  Blue Earth Tech, Inc., a Nevada corporation, employs, pays and provides

16  health and other benefits to nearly all employees of Blue Earth and its

17  subsidiaries (with the exception of EnSite).  BE Tech borrows from Blue

18  Earth to fund payroll obligations and holds intercompany receivables from

19  affiliates largely on account of payroll liabilities. BE Tech is a debtor in these

20  Chapter 11 Cases;

21  f.  EnSite,[4] a Delaware corporation, is a pre-revenue company that owns two

22  technology business units and the proprietary technology assets.  Specifically,

23  EnSite owns Blue Earth Energy Power Solutions, LLC, an Oregon limited

24  liability company, which includes the UPStealth® NiZn Battery

25  Management/Backup System, as well as Blue Earth Power Performance

26  Solutions, Inc., an Oregon corporation, which includes the Real-Time

27  Intelligence Edge (RTi Edge™) Building Energy Management System.  The

28

---

[4] Blue Earth owns approximately 72% of the equity interests in EnSite.

24

majority of EnSite employees are located in Wilsonville, Oregon, where the company manufactures its UPStealth® NiZn based intelligent digital battery backup system for signalized traffic intersections, and the RTi Edge™ Building Energy Management System. As of October 2014, EnSite owns a 24.4% interest in PowerGenix Systems, Inc. ("**PowerGenix**"), a Delaware corporation. According to an "Appraisal Report As of April 4, 2016," prepared by Ice Glen Associates, LLC, the fair market value of the 20,250,000 shares of common stock held by Blue Earth in EnSite (representing a 72% ownership interest) is $4,860,000.00 (market-based value);

g.    E2B Growth, Inc., a Nevada corporation, has no business operations;

h.    Maili PV-01 LLC, a Hawaii limited liability company; and Maili PV-03 Limited; Maili PV-05 Limited; Maili PV-06 Limited; and Makaha PV-02 Limited, each a Hawaii corporation, relate to the following solar projects, respectively: Melga Solar Project, RNI1 Solar Project; Sabrina Solar Project; Cozzens Solar Project; and Kamata Solar Project;

i.    Blue Earth Energy Management Services, Inc., a California corporation: This entity has no business operations; and

j.    Blue Earth Finance, Inc., a Nevada corporation: This entity has no business operations.

An organizational chart showing the relationships among Blue Earth and its subsidiaries is attached hereto as **Exhibit "4"**.

**B.**    **Summary of Prepetition Debt**

**1.**    **Jackson Investment Group LLC**

On September 10, 2015, Blue Earth entered into a Note Purchase Agreement ("**JIG NPA**") with JIG pursuant to which a 15% senior secured note in the principal amount of $10,600,000 was issued with a maturity date of February 29, 2016 (the "**September 2015 Secured Note**"). The proceeds of the September 2015 Secured Note were used, among other things, to refinance that certain 12% Senior Convertible Note, in the principal amount of $10,000,000 issued on March 10,

25

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

2015 by Blue Earth to JIG pursuant to that certain Note and Warrant Purchase Agreement dated as of March 10, 2015, by and among Blue Earth and JIG. The Guarantors (defined below) and Blue Earth entered in that certain Omnibus Amendment and Joinder Agreement dated as of September 10, 2015 pursuant to which, among other things, Blue Earth and the Guarantors agreed that (i) the Prepetition Note Security Agreement (defined below) secured all obligations of Blue Earth under the JIG NPA and the September 2015 Secured Note and all guaranty obligations of the Guarantors under the Prepetition Guaranty Agreement (defined below), and (ii) that the guarantors guaranteed all obligations of Blue Earth under the JIG NPA and the September 2015 Secured Note pursuant to the Prepetition Guaranty Agreement (defined below). A similar omnibus agreement was entered into in connection with each subsequent issuance of Prepetition Secured Notes.

On December 11, 2015, Blue Earth borrowed $7,154,659 from JIG under the JIG NPA, evidenced by a 9% Senior Secured Note also due on February 29, 2016 (the "**December 2015 Secured Note**"). This loan was made, in part, to repay an October 23, 2015, note in the amount of $5,154,508 issued by Blue Earth to JIG. Interest is payable on the Maturity Date in cash or, at Blue Earth's option, in Blue Earth Common Stock at $0.50 per share.

Pursuant to the JIG NPA, Blue Earth issued a 9% Senior Secured Note due February 29, 2016 in favor of JIG on February 11, 2016, in the original principal amount of $250,000 (the "**First February 2016 Secured Note**"). Blue Earth also issued a 9% Senior Secured Note due March 31, 2016, in favor of JIG on February 29, 2016, in the original principal amount of $100,000 (the "**Second February Secured 2016 Note**").

On March 18, 2016, Blue Earth issued a 9% Senior Secured Note due May 18, 2016, in favor of JIG in the original principal amount of $150,000 (the "**First March Secured 2016 Note**"). Three days later, Blue Earth issued a 9% Senior Secured Note due May 18, 2016, in favor of JIG in the original principal amount of $569,581.55 (the "**Second March Secured 2016 Note**" and together with the September 2015 Secured Note, the December 2015 Secured Note, the First February 2016 Secured Note, the Second February Secured Note and the First March Secured Note, the "**Prepetition Secured Notes**").

26

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

Blue Earth's obligations to JIG under the Prepetition Secured Notes were guaranteed and secured by subsidiaries Blue Earth Generator, Inc., Blue Earth Finance, Inc., Blue Earth Management Services, Inc., Blue Earth Solar, Inc., Blue Earth Power Performance Solutions, Inc., ecoLegacy Gas & Power, LLC, Blue Earth Energy Power Solutions, LLC, BE Tech, Blue Earth CHP, Inc., Brooks, E2B Growth, Inc., and EnSite (collectively, the "**Guarantors**") pursuant to (a) that certain Guaranty, dated as of March 10, 2015, by and among the Guarantors in favor of JIG; and (b) that certain Pledge and Security Agreement, dated as of March 10, 2015, by and among Blue Earth, the Guarantors, JIG and each other signatory thereto, through which Blue Earth and each of the Guarantors granted to JIG security interests (the "**JIG Prepetition Liens**") on substantially all of Blue Earth's and each Guarantor's assets, subject to certain exceptions (the "**JIG Prepetition Collateral**").

The JIG Prepetition Collateral excludes certain assets pledged to TCA (as defined below) and Blue Earth's prepetition agreements with JIG contain a subordination provision that subordinates the JIG Prepetition Liens to liens pledged to Laird Q. Cagan (the "**Cagan Subordination**") which subordination is limited to not more than $1,333,147 (less any principal repayments thereof) in secured debt in respect of the Cagan Loan (as defined below) in accordance with Section 28(b) of that certain Pledge and Security Agreement dated March 10, 2015, among Blue Earth and certain of its subsidiaries and JIG.

As of the Petition Date, the Debtors were indebted to JIG in an amount (including certain principal default amounts) of not less than approximately $23,282,326.

As of the Petition Date, JIG owned approximately 13% of the voting securities of Blue Earth, representing 13,995,618 common shares. JIG has rights to acquire additional shares, which remain unexercised as of the Petition Date.

### 2. TCA Global Credit Master Fund LP

Blue Earth and twelve of its direct and indirect wholly-owned subsidiaries entered into a Credit Agreement with TCA Global Credit Master Fund LP ("**TCA**"), dated as of January 31, 2013, effective February 22, 2013 and last amended on July 6, 2015 (the "**TCA Agreement**"). Pursuant to the Second Amendment to the TCA Agreement, dated February 24, 2015, TCA loaned Blue Earth

27

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

$3,000,000, secured by 100% of Blue Earth's membership interests in Maili PV 01, LLC, and Blue Earth CHP, Inc.'s, membership interests in Sumter, as well as shares of Blue Earth's Series D Convertible Preferred Stock.

As of the Petition Date, TCA asserted a Claim in the amount of $916,378.91.

### 3. Laird Q. Cagan

Through a series of promissory notes issued from 2012 through 2013, Blue Earth has borrowed funds from Laird Q. Cagan, the Chairman of its Board of Directors. The notes bear interest at 12% per annum and, per a Security Agreement, dated December 12, 2012, Blue Earth's obligations under such promissory notes are putatively secured by all rights and proceeds of five photovoltaic installations in southern California in connection with a Solar PV Joint Development Agreement, dated August 14, 2012, with SunValley Solar, Inc. Mr. Cagan entered into a Subordination of Loans Agreement with TCA, dated January 31, 2013. The Debtors and JIG are investigating the validity, priority and amount of Mr. Cagan's claims, including, without limitation, whether Mr. Cagan is not the Holder of a Secured Claim against the Debtors because the SunValley contractual relationship is with Blue Earth subsidiary Blue Earth Solar, Inc., not either of the Debtors.

Mr. Cagan asserts an indebtedness of $1,720,736.52 as of the Petition Date. Of this amount, $1,333,000 constitutes a permitted indebtedness under the JIG NPA as of March 2015 (the "**Cagan Loan**").

### C. Incomplete EnSite "Spinoff"

On June 26, 2015, the Board of Directors of Blue Earth voted to form EnSite to best allocate the company's limited resources and focus on its BE CHP and BE Solar divisions. On August 31, 2015, Blue Earth transferred to EnSite all of the stock of Blue Earth Energy Power Solutions, LLC, and Blue Earth Power Performance Solutions, Inc., and its equity interest in PowerGenix in consideration of the 20,250,000 shares of EnSite which it intended to spinoff to its shareholders and those derivative security holders entitled to a dividend. Blue Earth announced the record date for the spinoff would be December 1, 2015, subject to certain regulatory notifications, approvals and other customary closing conditions. Blue Earth voluntarily filed a schedule 14C Information Statement

28

and mailed it to its shareholders of record on December 1, 2015. The spinoff could not be completed until such time that EnSite became a reporting company with the SEC. Therefore, the spinoff has not been completed.

**D.     Events Leading to Chapter 11 Filing**

On February 1, 2016, Blue Earth failed to make a payment to TCA of $177,697.58 for interest and principal. In addition, on February 24, 2016, Blue Earth failed to pay TCA the final investment banking fee of $100,000. The next day, TCA declared Blue Earth to be in default of the TCA Agreement. TCA advised the company that it had ten days from February 25, 2016, to remedy or cure the default. TCA warned that if the company was unable to cure the default, TCA may declare the outstanding principal balance of $1,029,842.13 under the note, together with all other obligations due under the note and loan documents immediately due and payable, together with all accrued and unpaid interest at a default rate of 17% per annum, and pursue all of its rights and remedies, including the conversion of its Convertible Preferred Stock into common stock at the average closing price of the Company's common stock for the 10 Business Days immediately preceding a Conversion Notice.

The company also failed to make the February 1, 2016, interest payment to JIG and cure the default within three (3) Business Days. Upon this uncured default, interest began to accrue at 21% per annum and JIG had the right to demand payment of a "Mandatory Default Amount" equal to 115% of the principal amount of the Note (or $12,190,000), together with interest, fees, expenses and all other amounts owed under the JIG NPA and all ancillary agreements. An additional $250,000 principal amount was borrowed from JIG on February 11, 2016. Commencing five (5) days after the occurrence of an Event of Default, the interest rate on this recent note increases from 9% to 18% per annum and a "Mandatory Default Amount" equal to 118% (or $295,000) of the principal amount of the note is to be paid , plus all accrued and unpaid interest thereon. The company did not pay two of its notes to JIG that matured on February 29, 2016.

On March 1, 2016, JIG provided Blue Earth and its guarantor subsidiaries with a Notice of Default, thereby putting substantially all of the company's assets at risk of foreclosure (other than those pledged to TCA, and certain other assets). Prior to the Petition Date, Blue Earth was in debt

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

1  restructuring discussions with JIG and was actively seeking project financing that would be used to

2  repay a substantial portion of its indebtedness to JIG.  However, the company was unable to access

3  the equity markets given the deterioration of its market price, as well as general market conditions.

4      The Debtors commenced these Chapter 11 Cases in order to obtain necessary financing and

5  restructure Blue Earth's balance sheet through a debt-for-equity swap with JIG to be implemented

6  through the Plan.

7  **E.**      **Prepetition Litigation**

8      Prior to the Petition Date, the Debtors were parties to the following litigation:

| Caption of Matter and Case No. | Nature of Proceeding | Court or Agency Location | Status |
|---|---|---|---|
| Powell vs. Cagan A-15-723839-C Division VII | Verified Shareholder Derivative Action | 8th District Court, Clark County, NV | Pending |
| Cinaci vs. Blue Earth 2:14-CV-08263-DSF-JEM | Class Action – Security Law Violation | US District Court, Central District CA | Pending |
| Davis & Patalano v. Blue Earth, Inc. 01-14-000-0952 | Breach of Consulting Agreement | AAA John H L'Estrange, Jr., Arbitrator | Concluded |
| Hawaii Solar & NEP vs. Blue Earth DPR No 15-0044-A | Non-performance under Solar EPC contract | Dispute Prevention & Resolution – State of Hawaii Keith W. Hunter, Arbitrator | Concluded |

**1.**      **Blue Earth, Inc. Securities Litigation**

    On October 24, 2014, a purported class action lawsuit was filed against Blue Earth, two

executive officers, and one non-executive officer in the United States District Court for the Central

District of California (Case No:2:14-cv-08263).  On January 21, 2015, the court appointed a Lead

Plaintiff and Lead Plaintiff's Counsel.  The Court also re-captioned the case *In re Blue Earth, Inc.*

*Securities Litigation*, File No. CV 14-8263 DSF (JEMx).

    On March 13, 2015, the plaintiff filed a First Amended Complaint which alleges claims

under Sections 10(b) and 20(a) of the Exchange Act, and a purported class of purchasers of the

company's stock during the period from October 7, 2013, through October 21, 2014.  The

defendants filed a motion to dismiss the complaint on May 4, 2015.  On November 4, 2015, the court

dismissed all of the claims in the complaint with leave to amend.  The plaintiffs filed a Second

Amended Complaint on November 30, 2015.

30

On January 15, 2016, the defendants moved to dismiss the Second Amended Complaint. As a result of the commencement of the Chapter 11 Cases, this matter is stayed as to Blue Earth. However, it is not stayed as to the individual defendants and the hearing regarding the motion to dismiss is currently scheduled for June 6, 2016.

## 2.    Derivative Lawsuit

On August 31, 2015, a derivative lawsuit was filed in Nevada state court on behalf of a purported shareholder of Blue Earth, captioned *Powell v. Cagan, et al.*, No. A-15-723839-C (8th Judicial District Court, Clark County, Nevada). The complaint names as defendants Brett Woodard, Johnny R. Thomas, John C. Francis, and the entire Blue Earth Board of Directors. It also names the company as a nominal defendant. The complaint asserts claims for breach of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, and waste of corporate assets, from October 2013 to the date the complaint was filed. The plaintiff alleges that the defendants failed to prevent Blue Earth from making certain purportedly false and misleading statements. The lawsuit was stayed prior to the Petition Date pending the resolution of the motions to dismiss the Blue Earth, Inc. Securities Litigation. Thereafter, Blue Earth filed a notice with the court indicating that, as a result of the commencement of the Chapter 11 Cases, the plaintiffs lack standing to prosecute the action. A status hearing is scheduled for June 16, 2016.

## F.    SEC Staff Review and Investigation

On January 12, 2016, Blue Earth disclosed in a Form 8-K securities filing that on January 11, 2016, the Audit Committee of the Board of Directors ("**Audit Committee**") of Blue Earth, after consultation with HJ & Associates, LLC, Blue Earth's independent registered public accounting firm, determined that the company's financial statements for the year ended December 31, 2014, and the quarters ended March 31, June 30, and September 30, in 2014 and 2015 included in Blue Earth's Annual Reports on Form 10-K and Quarterly Reports on Form 10-Q for such periods, and together with all three-, six- and nine- month financial information contained therein (collectively, the "**Non-Reliance Periods**"), can no longer be relied upon. The company further disclosed that, therefore, all earnings press releases and similar prior communications issued by Blue Earth as well as other prior statements made by or on behalf of the company relating to those periods should not be relied upon.

31

DOCS_LA:298397.7

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

Blue Earth advised that it intended to present annual and quarterly restated financial statements in amendments to its Annual Report on Form 10-K for the year ended December 31, 2014, and its Quarterly Reports on Form 10-Q for the quarters ended March 31, June 30, and September 30, 2015, and, if required for the quarters ended March 31, June 30, and September 30, 2014 (the "**Restated Filings**"), as soon as practicable.

Blue Earth also disclosed that the Audit Committee's decision to restate these financial statements is in connection with a review by the staff (the "**Staff**") of the SEC of its Annual Report on Form 10-K for the year ended December 31, 2014, and Form 10-Q for the quarter ended September 30, 2015 (the "**Staff Review**"), and subsequent communications between the Staff and the company relating to the Staff Review. As a result of this review, Blue Earth, under the direction of its Audit Committee, re-evaluated its historical and then current practices with respect to its treatment of a purchased asset as an intangible asset in accordance with accounting principles generally accepted in the United States of America. In connection with this re-evaluation and upon further review of the accounting literature, the company concluded that the accounting for the issuance of shares to Donald R. Kendall, Jr., in connection with the Blue Earth's acquisition of Kenmont Solutions Capital ("**KSC**"), Mr. Kendall's company, should follow the guidance in ASC Topic 718, Compensation-Stock Compensation. There are no market, performance or service conditions that must be met in the employment contract. Further, there are no restrictions on the shares issued under the KSC acquisition. Accordingly, the fair value of the shares issued to Mr. Kendall should have been expensed in the period the shares were issued. Accordingly, Blue Earth disclosed that it will restate its financial statements to classify the acquisition cost of KSC as employee compensation costs and record the full expense for the year ended December 31, 2014.

In late March 2016, Blue Earth learned that the SEC is conducting an investigation of corporate and financial matters relating to the company. The company intends to cooperate fully with any SEC requests.

## G. **Postpetition Events**

### 1. **"First Day" Motions**

On March 23, 2016, the Bankruptcy Court heard and granted the following motions:

DOCS_LA:298397.7

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

a. *Application for Order Approving Designation of G. Robert Powell as Responsible Individual Pursuant to Bankruptcy Local Rule 4002-1* [Docket No 4], in which the Debtors sought to authorize G. Robert Powell, its Chief Executive Officer, as the natural person to be responsible for the duties and obligations of the Debtors during the Chapter 11 Cases;

b. *Motion for Order Authorizing Debtor to (A) Maintain Existing Bank Accounts and (B) Continue Use of Cash Management System* [Docket No. 5], in which the Debtors requested entry of an order (i) authorizing continued use of their cash management system; (ii) authorizing the Debtors to maintain prepetition bank accounts; and (iii) authorizing the Debtors to continue using their existing business forms and checks; and

c. *Motion of Debtors for Order (1) Establishing Bar Date for Filing Proofs of Claim and (2) Approving Form and Manner of Notice of Bar Date* (the "**Bar Date Motion**") [Docket No. 8], in which the Debtors requested entry of an order establishing May 23, 2016, as the deadline by which creditors that wish to assert claims against the Debtors must File Proofs of Claim and approving the form of notice of such bar date.

On March 28, 2016, the Bankruptcy Court heard and granted the following motions:

d. *Motion for Order Authorizing the Debtor to (i) Pay Pre-Petition Employee Wages, Obligations and Contributions to Employee Benefit Plans; and (ii) for the Debtor and Banks and Other Financial Institutions to Comply with Procedures Relating Thereto* [Docket No. 6], in which the Debtors sought an order of the Bankruptcy Court authorizing the Debtors to (i) honor prepetition employee wages, obligations and contributions to benefit plans for their employees, and (ii) to the extent that certain banks and other financial institutions are required to receive, process, honor, and pay checks presented for payment by their employees, to comply with procedures and honor all funds transfer requests made by the Debtors relating thereto;

33

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

e.  *Motion of the Debtors For Entry of Interim and Final Orders Establishing Notification, Objection and Hearing Procedures for Transfers of Equity Securities* (the "**NOL Motion**") [Docket No. 7], through which the Debtors requested that the Bankruptcy Court establish certain notice, objection and hearing procedures regarding the transfer of beneficial interests in equity securities of Blue Earth.  The purpose of such procedures described in the NOL Motion is to restrict equity trading that could result in an ownership change prior to consummation of the Plan and lead to adverse tax consequences to the Debtors and prevent the Debtors from taking advantage of certain provisions in the Internal Revenue Code; and

f.  *Application for Order Under 28 U.S.C. § 156(c) Authorizing the Retention of Kurtzman Carson Consultants LLC As Noticing and Claims Agent for Clerk of the Bankruptcy Court Nunc Pro Tunc to the Petition Date* [Docket No. 9], in which the Debtors sought the authorization and approval of the retention and appointment of Kurtzman Carson Consultants LLC as claims and noticing agent for the Clerk to, among other things, (i) serve as the Bankruptcy Court's agent to mail certain notices to the Estates' creditors and other parties-in-interest, (ii) provide computerized claims and claims objections services, and (iii) provide expertise, consultation, and assistance with claim processing and with other administrative information related to the Debtors' bankruptcy cases.

## 2.  Employment of Professionals

On April 4, 2016, the Creditors' Committee filed and, the same day, the Bankruptcy Court approved the *Official Committee of Unsecured Creditors' Application to Employ Felderstein Fitzgerald Willoughby & Pascuzzi LLP as Bankruptcy Counsel* [Docket No. 53], seeking to employ the law firm of Felderstein Fitzgerald Willoughby & Pascuzzi LLP as its counsel in these cases.

On April 22, 2016, the Bankruptcy Court approved the *Debtors' Application to Employ Pachulski Stang Ziehl & Jones LLP as Attorneys for the Debtors Nunc Pro Tunc to The Petition*

34

*Date* [Docket No. 57], which authorized the Debtors' retention of Pachulski Stang Ziehl & Jones LLP as their general bankruptcy counsel, effective *nunc pro tunc* as of the Petition Date.

On May 4, 2016, the Bankruptcy Court approved the following retention applications:

a. *Debtors' Application to Employ EOS Capital Advisors LLC as Investment Banker Effective as of March 21, 2016, Pursuant to 11 U.S.C. § 327(a) and Fed. R. Bankr. P. 2014* (the "**EOS Employment Application**") [Docket No. 80]. In the EOS Employment Application, the Debtors requested authorization to employ EOS Capital Advisors LLC as their investment banker for the purpose of preparing independent valuations of facilities operated by Sumter and Brooks; and

b. *Debtors' Application to Employ Ice Glen Associates, LLC as Investment Banker Effective as of March 21, 2016, Pursuant to 11 U.S.C. § 327(a) and 328(a) and Fed. R. Bankr. P. 2014* [Docket No. 81], in which the Debtors sought to employ Ice Glen Associates, LLC, as their investment banker to assess the fair market value of Blue Earth's wholly-owned common stock of EnSite.

On May 5, 2016, the Bankruptcy Court approved the *Debtors' Application to Employ Davidoff, Hutcher & Citron LLP as Special Corporate Counsel, Effective as of March 21, 2016, Pursuant to Section 327(e) of the Bankruptcy Code* (the "**DHC Employment Application**") [Docket No. 83] remains pending. Through the DHC Employment Application, the Debtors sought authorization to employ the law firm of Davidoff, Hutcher & Citron LLP, as special corporate counsel to the Debtors, effective as of the Petition Date. The firm has served essentially as "outside" general counsel for the Debtors and certain non-debtor subsidiaries since September 2010 when the Debtors' current operations commenced upon a change in management.

On April 21, 2016, the Creditors' Committee filed the *Official Committee of Unsecured Creditors' Motion to (1) Approve Retention of Bartko, Zankel, Bunzell & Miller and Romero Park P.S. as Co-Special Investigation/Litigation Counsel on a Fixed Fee of $200,000 to Conduct Claims Analysis; (2) Pre-Approve Expenditure of up to $200,000 for Retention of Experts and Other Related*

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

*Costs; and (3) Approve Terms of the Bentham IMF Investigation Funding, Certain Break-Up Fees and a Right to Fund Future Litigation* [Docket No. 85] (the "**Bartko/Romero Employment and Funding Motion**") in which it sought authorization to employ two additional law firms – Bartko, Zankel, Bunzell & Miller ("**Bartko**") and Romero Park P.S. ("**Romero Park**") - on a $200,000 fixed fee basis to investigate claims against JIG and third parties. The Creditors' Committee also asked the Bankruptcy Court to pre-approve the expenditure of $200,000 for experts and other costs of the investigation and to approve the terms of an Investigation Funding Agreement between the Creditors' Committee and Bentham Capital LLC dba Bentham IMF ("**Bentham**") that would allow Bentham to fund the investigation in exchange for a variety of relief, including the granting of an exclusive right of first refusal to fund future litigation and a percentage of proceeds from future claims pursued as a result of the investigation. JIG and the Debtors opposed the Bartko/Romero Employment and Funding Motion [Docket Nos. 103, 106].

Pursuant to a hearing regarding the Bartko/Romero Employment and Funding Motion conducted on April 26, 2016, the Creditors' Committee (a) on April 29, 2016, separately filed an application to employ Bartko on an hourly billing and costs reimbursement basis [Docket No. 117]; and (b) on May 3, 2016, filed an amendment to the Bartko/Romero Employment and Funding Motion [Docket No. 120]. The Court scheduled a continued hearing regarding the Bartko/Romero Employment and Funding Motion on May 23, 2016.

### 3. DIP Financing

On April 29, 2016, the Bankruptcy Court entered a final order (the "**Final DIP Financing Order**") [Docket No. 116] granting the Debtors' *Motion for Interim and Final Orders (1) Authorizing Postpetition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3) and 364(d)(1); (2) Authorizing the Use of Cash Collateral; (3) Granting Security Interests and Superpriority Claims; (4) Providing Adequate Protection; (5) Modifying the Automatic Stay; and (6) Granting Related Relief* (the "**DIP Financing Motion**") [Docket No 11].[5] Among other relief, the Final DIP Financing Order authorized the Debtors to borrow up to an

---

[5] The Bankruptcy Court previously entered an Interim Order [Docket No. 28] regarding the DIP Financing Motion on March 24, 2016.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

aggregate principal amount of $3 million and utilize the financing and cash collateral to satisfy the fees and costs of professionals, to make disbursements in the ordinary course of the Debtors' business in accordance with a budget and to pay certain fees and expenses associated with the financing.

The Final DIP Financing Order also provides generally that, until all DIP Obligations and Prepetition Secured Obligations (as such and all other capitalized terms used in this section not otherwise defined herein are defined in the Final DIP Financing Order) are paid in full, the lender's commitments under the DIP facility have terminated and all challenges to the lender's prepetition loans and obligations have been waived, denied or barred, the lender will retain its prepetition liens and security interests. The DIP Obligations are secured by valid, enforceable, non-avoidable and fully perfected senior liens (except upon Avoidance and Other Actions), subordinate only to the Carve-Out, Permitted Liens and Existing Liens. The Final DIP Financing Order permits the Creditors' Committee or any other party in interest (except the Debtors) to challenge the Prepetition Secured Obligations, Prepetition Liens and related Claims no later than the earlier of (x) the date of entry of an order confirming the Plan or (y) the date that is 140 days after the Petition Date.

### 4. Motion for Relief from Stay Re: D&O Insurance Policies

On April 8, 2016, the Debtors filed the *Debtors' Motion for Entry of an Order Granting Limited Relief from Stay to Allow for Payment under D&O Insurance Policies* [Docket No. 58] (the "**D&O Motion**"), asking the Bankruptcy Court to lift the automatic stay under section 362 of the Bankruptcy Code to the extent necessary to allow insurers Liberty Insurance Underwriters, Inc., American International Group, Inc., and XL Specialty Insurance Company (collectively, the "**Insurers**") to perform under certain of the Debtors' directors' and officers' liability policies ("**D&O Policies**"). The Debtors sought an order of the Bankruptcy Court lifting the stay in order to allow the Insurers to advance defense costs to certain of the Debtors' current and former directors and officers who are parties to on-going litigation. On April 28, 2016, the Bankruptcy Court entered its order granting the D&O Motion [Docket No. 114].

DOCS_LA:298397.7

Case: 16-30296   Doc# 131   Filed: 05/06/16   Entered: 05/06/16 18:02:57   Page 42 of
78

## H. The Claims Bar Date

Pursuant to the Bar Date Motion, the Bankruptcy Court set May 23, 2016 as the deadline for creditors to File Proofs of Claim against the Debtors' Estates. The deadline for governmental units to File Proofs of Claim against the Debtors' Estates is September 17, 2016.

<div align="center">

**IV.**

**ADDITIONAL INFORMATION  RELEVANT TO THE PLAN**

</div>

## A. The Debtors' Assets and Liabilities[6]

On April 22, 2016, the Debtors filed amended Schedules [Blue Earth Docket No. 99; BE Tech Docket No. 11], in which they allege the aggregate value of Blue Earth's assets to be $51,568,171.37 (of which $9,367,442.00[7] consists of the gross aggregate value of Blue Earth's interests in its subsidiaries and $42,000,000.00, representing the book value as of December 31, 2015, of the Debtors' net operating losses), and amount of aggregate liabilities to be $27,071,836.27 ($23,996,434.91 of which is asserted secured debt and $3,044,457.29 of which constitutes general unsecured claims); and the aggregate value of BE Tech's assets to be $665.00 and aggregate liabilities of $41,867,242.49 (including  $21,747,056 in secured debt owed to JIG for which Blue Earth is co-liable, $19,901,316.56 in unsecured liabilities owed to Blue Earth on account of payroll funding and $86,123.31 in non-insider general unsecured claims).

The following chart shows the respective values of the Blue Earth subsidiaries:[8]

| Entity | Value |
|---|---|
| Blue Earth Capital, Inc. | 0 |
| Blue Earth CHP, Inc. | $2,750,000.00[9] |
| Blue Earth Energy Management Services, Inc. | 0 |

---

[6] Information regarding the valuation of the Debtors' subsidiaries is set forth in the *Periodic Report Regarding Value, Operations and Profitability of Entities in which the Estate of Blue Earth, Inc. Holds a Substantial or Controlling Interest* [Docket No. 79], filed by the Debtors on April 18, 2016 (the "**Rule 2015.3 Report**").

[7] Such valuation does not take into account the Debtors' subsidiaries' joint liability for JIG's secured debt and have other asserted secured debt at the subsidiary level owed to TCA.

[8] Unless stated otherwise, all values given are NOT net of secured indebtedness for which such entity may be co-liable.

[9] The Debtors state in their Rule 2015.3 Report that the value of Blue Earth CHP, Inc. "will be approximately equal to the sum of the value of its subsidiaries." Accordingly, the value given is the sum of the values of Brooks and Sumter. The entity's other subsidiaries do not have value.

<div align="center">

38

</div>

DOCS_LA:298397.7

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

| | |
|---|---|
| Blue Earth Finance, Inc. | 0 |
| Blue Earth Generator, Inc. | $280,400.00[10] |
| Blue Earth Solar, Inc. | 0 |
| Brooks | $2,000,000.00[11] |
| E2B Growth, Inc. | 0 |
| EnSite | $4,860,000.00[12] |
| Live Oak Heat & Power, LLC | 0 |
| Maili PV-01 LLC | 0 |
| Maili PV-03 Limited | 0 |
| Maili PV-05 Limited | 0 |
| Maili PV-06 Limited | 0 |
| Makaha PV-02 Limited | 0 |
| Marshalltown Heat & Power, LLC | 0 |
| Mt. Pleasant Heat & Power, LLC | 0 |
| Plainwell Heat & Power, LLC | 0 |
| Souderton Heat & Power LLC | 0 |
| Sumter | $750,000.00[13] |
| Tolleson Heat & Power, LLC | 0 |
| Worthington Heat & Power, LLC | 0 |

**B.**  **EnSite Post-Effective Date Equity Raise**

JIG and EnSite have entered into a Term Sheet, an Intercreditor Agreement and certain other agreements which establish the terms upon which EnSite can pursue additional capital in light of

---

[10] The value does not take into account the costs of liquidating the company's assets, which are fully encumbered by liens.
[11] This dissolution value of Brooks represents a midpoint value in the range of $1,600,000 on the low end and $2,400,000 on the high end, net of a mechanic's lien.
[12] The amount represents the market-based value of the 20,250,000 shares of common stock held by Blue Earth in EnSite, representing a 72% ownership interest.
[13] This amount represents a discounted cash flow value.

DOCS_LA:298397.7

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

JIG's claims against, and liens on the assets of, EnSite.  The following is a summary of these agreements, which is subject to the actual terms of the agreements between those parties.

Subject to the Effective Date, JIG has agreed that EnSite may raise equity by selling up to 20,000,000 newly-issued shares of its Series B Preferred Stock (the "**EnSite Series B Stock**") for at least $1.00 per share.  JIG has also agreed that new investors may immediately loan up to $2,100,000.00 to EnSite for required working capital (the "**EnSite Bridge Loan**") on a first lien priming basis (the "**EnSite Priming Lien**"), with the lien securing the EnSite Bridge Loan being subordinate to JIG's lien on EnSite's equity in, and any notes or payables from PowerGenix only.  Upon the Effective Date, the EnSite Bridge Loan will be converted into EnSite Series B Stock at $1.00 per share and the EnSite Priming Lien shall terminate.

Upon the funding of at least $1,000,000.00 of the EnSite Bridge Loan, JIG will hold a claim against EnSite in the amount of $2,000,000.00 (the "**JIG EnSite Claim**") secured only by a first priority lien on EnSite's equity in PowerGenix and a second priority lien on all other assets of EnSite (the "**JIG EnSite Liens**"). The JIG EnSite Claim will be waived and released and the JIG EnSite Liens will terminate immediately upon (i) the Effective Date and either (ii) at least $2,000,000.00 of EnSite shares are purchased from Blue Earth or (iii) EnSite sells $10,000,000.00 or more of EnSite Series B Stock.  If neither (ii) nor (iii) occurs within twelve months of the Effective Date, then the JIG EnSite Liens will not terminate and the JIG EnSite Claim will be due and payable on the date that is twelve months from the Effective Date.

The lenders of the EnSite Bridge Loan have agreed to forbear from exercising any rights upon a default and shall only be permitted to enforce the EnSite Bridge Loan and EnSite Priming Lien and foreclose on the assets of EnSite (excluding the stock in PowerGenix) upon the first to occur of (i) a sale of substantially all of the assets of Blue Earth that does not provide for the sale or assignment of at least a controlling interest in the equity of Blue Earth to JIG, (ii) confirmation of a plan that does not provide for the sale or assignment of at least a controlling interest in the equity of Blue Earth to JIG, (iii) the conversion of Blue Earth's chapter 11 case to chapter 7, and (iv) a change of control or management of EnSite without the consent of the EnSite Bridge Loan lenders.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

40

JIG has agreed to cause Blue Earth, after the Effective Date, to grant purchasers of EnSite Series B Stock an option to purchase up to 20,250,000 shares of EnSite from Blue Earth at prices that start at $0.25 per share if purchased within 30 days of the Effective Date and that increase in 30 day increments to a maximum of $1.00 per share for purchases from 210 to 240 days after the Effective Date. If EnSite investors have not purchased 100% of the equity of EnSite owned by Blue Earth on or before the date that is 240 days following the Effective Date, then the remaining shares of EnSite owned by Blue Earth shall be exchanged for an equal number of shares of EnSite Series B Stock.

JIG and EnSite have agreed that JIG shall be entitled to elect a majority of the EnSite Board members until such time as Blue Earth owns less than 50% of the outstanding shares of EnSite, and that JIG and the EnSite Series B Stock holders shall each have proportionate representation on the Board so long as they own more than 10% of the outstanding shares of EnSite.

**C. SEC Filings**

As a public company, Blue Earth had been required to file appropriate reports with the SEC, including quarterly statements of its operational and financial status and reports of significant events. All of Blue Earth's public securities filings are available at http://www.sec.gov/edgar/searchedgar/companysearch.html. Blue Earth will continue to file Form 8-K reports during the pendency of the Chapter 11 Cases.

Effective at the opening of business on March 28, 2016, Blue Earth's common stock was suspended and was thereby delisted from The Nasdaq Stock Market. Under the Plan, Blue Earth will become a private company after the Effective Date.

**V.**

**CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES**

**A. Introduction**

The following discussion summarizes certain U.S. federal income tax consequences of the implementation of the Plan to the Debtors and to certain Holders of Claims. This discussion does not address the U.S. federal income tax consequences to Holders of Claims who are Unimpaired, otherwise entitled to payment in full in Cash under the Plan, or deemed to reject the Plan.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

The discussion of U.S. federal income tax consequences below is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), Treasury regulations promulgated thereunder, judicial authorities, published positions of the IRS, and other applicable authorities, all as in effect on the date of this Disclosure Statement and all of which are subject to change or differing interpretations (possibly with retroactive effect). No ruling has been or will be sought from the IRS, and no legal opinion of counsel will be rendered, with respect to the matters discussed below. There can be no assurance that the IRS will not take a contrary (or less favorable) position regarding the federal income tax consequences resulting from the consummation of the Plan or that any contrary or different position would not be sustained by a court.

This summary does not address foreign, state, or local tax consequences of the contemplated transactions, nor does it purport to address the U.S. federal income tax consequences of the transactions to certain classes of taxpayers subject to special rules (including, without limitation, Holders that are not "United States persons" as defined in the Tax Code, small business investment companies, regulated investment companies, real estate investment trusts, banks and certain other financial institutions, insurance companies, tax-exempt organizations, retirement plans, individual retirement and other tax-deferred accounts, Holders that are, or hold Claims through, partnerships or other pass-through entities for U.S. federal income tax purposes, persons whose functional currency is not the U.S. dollar, dealers in securities or foreign currency, traders that mark-to-market their securities, persons subject to the alternative minimum tax or the "Medicare" tax on net investment income, persons that acquired Claims at a "market discount," and persons holding Claims that are part of a straddle, hedging, constructive sale, or conversion transaction). In addition, this discussion does not address U.S. federal taxes other than income taxes.

This discussion assumes that the Claims are held as "capital assets" (generally, property held for investment) within the meaning of section 1221 of the Tax Code and that the various debt and other arrangements to which the Debtors are a party will be respected for U.S. federal income tax purposes in accordance with their form.

The following summary of certain U.S. federal income tax consequences is for informational purposes only and is not a substitute for careful tax planning and advice based upon a Holder's individual circumstances.

**B.**     **Federal Income Tax Consequences to the Debtor**

**1.**     **COD Income and Attribute Reduction**

As of December 31, 2015, the Debtor Blue Earth had a consolidated federal income tax net operating loss ("**NOL**") carryforward of approximately $42 million, in addition to other tax attributes. The Debtor expects that it will incur an additional NOL for the tax year ending December 31, 2016.

In general, cancellation of debt income ("**COD**") realized by a debtor on the discharge of debts in the context of a bankruptcy proceeding will not result in taxable income to the debtor, although it will cause the reduction in certain of the debtor's tax attributes (such as NOLs, capital loss carryforwards, tax credits, and tax basis in assets). The amount of COD realized equals the excess of the adjusted issue price of indebtedness discharged over the sum of the amount of cash, the issue price of any debt instrument and the fair market value of any other property given in exchange therefor, subject to certain statutory or judicial exceptions that can apply to limit the amount of COD (such as where the payment of the cancelled debt would have given rise to a tax deduction). If advantageous, the borrower can elect to reduce the basis of depreciable property prior to any reduction in its NOL carryforwards or other tax attributes. Where a debtor (such as the Debtor) joins in the filing of a consolidated U.S. federal income tax return, applicable Treasury regulations require, in certain circumstances, that the tax attributes of the consolidated subsidiaries of the debtor and other members of the group also be reduced.

The Debtor expects to realize an amount of COD in connection with the implementation of the Plan as a result of the satisfaction of certain Claims that qualify as indebtedness for federal income tax purposes at a discount or for no consideration. As a result, the Debtor expects that some of its tax attributes will be reduced following the implementation of the Plan.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

43

Any reduction in tax attributes under the COD rules does not occur until after such attributes have been applied to determine the tax in the year of discharge or, in the case of asset basis reduction, the first day of the taxable year following the tax year in which the COD is realized.

## 2. Treatment of Any Remaining NOLs; Section 382

To the extent the Debtor Blue Earth has any NOLs remaining after implementation of the Plan, the Debtor's ability to utilize those NOLs may be limited under Section 382 of the Tax Code. Section 382 contains certain rules limiting the amount of NOLs a corporate taxpayer can utilize in each taxable year following an "ownership change." In general, an "ownership change" occurs whenever the percentage of the stock of a corporation owned, directly or indirectly, by "5-percent stockholders" (within the meaning of Section 382) increases by more than 50 percentage points over the lowest percentage of the stock of such corporation owned, directly or indirectly, by such 5-percent stockholders at any time over the preceding three-year period. Certain special rules under Section 382 apply to corporations that experience an ownership change in connection with a bankruptcy proceeding and allow for conversion of qualifying debt to equity without causing an ownership change.

The Debtor Blue Earth believes it is possible that the consummation of the Plan will not result in an ownership change under Section 382 because of the substantial overlap in ultimate beneficial ownership among the Holders of Claims that will receive Reorganized Blue Earth Equity Interests pursuant to the Plan, on the one hand, and the Holders of Blue Earth Equity Interests, on the other hand and because new equity interests are being received in exchange for qualifying debt and the Debtor Blue Earth is in a chapter 11 case. The Debtor Blue Earth is continuing to evaluate whether the Plan would result in an ownership change, and, if so, the potential impact of Section 382 (including certain relief provisions of Section 382 that may apply to an ownership change resulting from a bankruptcy restructuring) on its ability to utilize any NOLs that may remain following the implementation of the Plan and the application of the attribute reduction rules discussed above. Nevertheless, the Plan Proponents believe that the Plan will not result in an ownership change that would impact the ability to use the NOLs, and the issuance of Reorganized Blue Earth Equity Interests to JIG shall be in accordance with Section 382(l)(5) of the Tax Code.

44

DOCS_LA:298397.7

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

## C.  Federal Income Tax Consequences to Holders of Claims

### 1.  General

Subject to the discussion in the following paragraphs, (i) a Holder of an Allowed Claim generally will recognize taxable gain or loss for U.S. federal income tax purposes in an amount equal to the difference, if any, between the "amount realized" in respect of such Claim under the Plan and its tax basis in such Claim, (ii) the Holder's tax basis in any property received generally should equal the fair market value of such property as of the Effective Date, and (iii) the Holder's holding period for the property should begin on the day following the Effective Date.  In general, a Holder's amount realized will equal the amount of cash plus the fair market value of any property received (or deemed received in the case of Holders that are beneficiaries of the Litigation Trust) in respect of such Claim (or, if the property received in respect of a Claim is a debt instrument for federal income tax purposes, the "issue price" of such debt instrument as determined under applicable Treasury regulations).

### 2.  Possible Treatment as Tax-Free Recapitalization

If a Holder of a Claim that is classified as a "security" of the Debtors for U.S. federal income tax purposes receives from the Debtors in respect of such Claim property that constitutes stock of or a "security" issued by the Debtors, then the exchange of such Claim for such property may qualify as a "recapitalization" under Section 368 of the Tax Code.  In that case, a Holder generally (i) should not recognize any gain or loss on its receipt of such property, (ii) should have a tax basis in the property received equal to its tax basis in such Claim and (iii) should have a holding period for such property that includes its holding period for such Claim.  However, a Holder may be required to recognize gain if, in addition to receiving property that is a "security," the Holder receives cash or other property that is not a "security" in respect of such Claim.

The term "security" is not defined in the Tax Code or in the Treasury regulations issued thereunder and has not been clearly defined by judicial decisions.  As applied to debt obligations, the meaning of the term "security" is unclear.  The determination of whether a particular debt obligation constitutes a "security" depends on an overall evaluation of the nature of the debt obligation, including whether the holder of such debt obligation is subject to a material level of entrepreneurial

DOCS_LA:298397.7

risk and whether the debt obligation is intended to give the holder a continuing proprietary interest in the issuer. One of the most significant factors considered in determining whether a particular debt obligation is a security is its original term. In general, debt obligations issued with a weighted average maturity at issuance of less than five years do not constitute securities, whereas debt obligations with a weighted average maturity at issuance of ten years or more constitute securities. Holders are urged to consult their own tax advisors regarding the possibility that the receipt of property in respect of a Claim pursuant to the Plan may qualify as a recapitalization.

### 3. Character of Gain or Loss; Loss Limitations

The character of any gain or loss recognized by a Holder as capital or ordinary and, in the case of capital gain or loss, as long-term or short-term, will be determined by a number of factors, including, but not limited to, the tax status of the Holder, the nature of the applicable Claim in the Holder's hands, the purpose and circumstances of its acquisition of the Claim, the Holder's holding period of the Claim, the extent to which the Holder previously claimed a bad debt deduction for all or a portion of the Claim, and the extent, if any, to which the Holder acquired the Claim at a market discount. The deductibility of capital losses is subject to certain limitations. In addition, other special rules could apply that might preclude a Holder from claiming a current deductible loss for tax purposes that would otherwise be allowed upon consummation of the Plan. Holders are urged to consult their own tax advisors regarding the characterization of any gain or loss recognized, and the possible application of any rules limiting the deductibility of any loss recognized, in connection with the Plan.

### 4. Amounts Received in Respect of Accrued But Unpaid Interest

Pursuant to the Plan, amounts received in respect of Allowed Claims will be allocated for tax purposes first to the principal amount of such Claims, with any excess allocated to any unpaid accrued interest. However there is no assurance that the IRS will respect such allocation for federal income tax purposes. In general, to the extent that an amount received (whether stock, cash or other property) by a Holder of a Claim is received in satisfaction of interest that accrued during its holding period, such amount will be taxable to the Holder as interest income if not previously included in the Holder's gross income. Conversely, a Holder generally recognizes a deductible loss to the extent

Case: 16-30296    Doc# 131    Filed: 05/06/16    Entered: 05/06/16 18:02:57    Page 51 of 78

that it does not receive payment of interest that has previously been included in its income. Holders of Claims are urged to consult with their tax advisors regarding the allocation of consideration and deductibility of unpaid interest (including the characterization of any deductible loss in respect of any unpaid interest as a capital or ordinary loss).

### 5. Treatment of the Litigation Trust

The Litigation Trust will be established for the primary purpose of liquidating its assets, in accordance with Treas. Reg. § 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Litigation Trust.

The Litigation Trust is intended to qualify as a "grantor trust" for federal income tax purposes with the Litigation Trust Beneficiaries treated as grantors and owners of the Litigation Trust. For all federal income tax purposes, all parties (including the Debtors, the Litigation Trustee, and the Litigation Trust Beneficiaries) are required to treat the transfer of the Litigation Trust Assets by the Debtors to the Litigation Trust (as set forth in the Litigation Trust Agreement) as a transfer of such assets by the Debtors to the Litigation Trust Beneficiaries entitled to distributions from the Litigation Trust Assets, followed by a transfer by such beneficiaries to the Litigation Trust. Thus, the Litigation Trust Beneficiaries shall be treated as the grantors and owners of a grantor trust for federal income tax purposes.

The Litigation Trustee will file tax returns with the IRS for the Litigation Trust as a grantor trust in accordance with Treasury Regulation Section 1.671-4(a). The Litigation Trustee will also send to each beneficiary of the Litigation Trust a separate statement setting forth the beneficiary's allocable share of items of income, gain, loss, deduction or credit and will instruct the beneficiary to report such items on such beneficiary's federal income tax return.

The Litigation Trustee may invest the Litigation Trust Assets transferred to the Litigation Trust, the proceeds thereof, or any income earned by the Litigation Trust in accordance with the Litigation Trust Agreement. However, the scope of any such investments will be limited to include only those investments that a Litigation Trust, within the meaning of Treas. Reg. § 301.7701-4(d),

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

may be permitted to hold, pursuant to the Treasury regulations, or any modification in the IRS guidelines (whether set forth in IRS rulings, other IRS pronouncements or otherwise).

The Litigation Trustee will require any Litigation Trust Beneficiary or other party receiving a distribution to furnish to the Litigation Trustee in writing such beneficiary's social security number or other taxpayer identification number ("**TIN**") as assigned by the IRS and the Litigation Trustee may condition any distribution to any Litigation Trust Beneficiary or other party receiving a distribution upon receipt of such TIN.

### 6. Information Reporting and Backup Withholding

All amounts paid to Holders of Allowed Claims under the Plan are subject to any applicable withholding tax requirements. Under certain circumstances, interest, dividends, and other reportable payments, may be subject to "backup withholding," currently at a rate of 28%. Backup withholding generally applies if the holder (a) fails to furnish its TIN, (b) furnishes an incorrect TIN, (c) fails properly to report interest or dividends, or (d) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the TIN provided is its correct number and that it is not subject to backup withholding. Backup withholding is not an additional tax but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax. Certain persons are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions.

THE FOREGOING DISCUSSION OF FEDERAL INCOME TAX CONSIDERATIONS IS FOR GENERAL INFORMATION PURPOSES ONLY AND IS NOT TAX ADVICE. EACH HOLDER SHOULD CONSULT ITS OWN TAX ADVISOR REGARDING THE FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES OF THE PLAN DESCRIBED HEREIN.

### VI.

### LIQUIDATION ANALYSIS

Pursuant to section 1129(a)(7) of the Bankruptcy Code, unless there is acceptance of a plan by an impaired class, the debtor must demonstrate, and the bankruptcy court must determine, with respect to such class, each holder of a claim or interest will receive property of a value, as of the

48

effective date of the plan that is not less than the amount that such holder would receive if the debtor were liquidated under chapter 7 of the Bankruptcy Code on the effective date of such plan. This requirement is commonly referred to as the "Best Interests Test." For the reasons set forth below, the Plan Proponents submit that the Plan easily satisfies the "Best Interests Test" and therefore should be approved.

The Plan Proponents estimate that in these Chapter 11 Cases, General Unsecured Creditors will receive either (a) a guaranteed dividend of 5% on account of Allowed Claims, with the opportunity to recover up to 100% plus interest, subject to distributions from the Litigation Trust based on net proceeds from Trust Causes of Action; or (b) a guaranteed distribution equal to 30% of their Allowed Claim. Alternatively, based on the Liquidation Analysis attached hereto as **Exhibit "3"**, the Plan Proponents believe that if the Debtors were liquidated under chapter 7, Holders of General Unsecured Claims would receive no distributions, except to the extent there are material recoveries from litigation.

The Plan Proponents believe there are a number of reasons why recoveries to unsecured creditors would be reduced in a chapter 7 liquidation. First, since the Debtors' assets are fully encumbered by the liens of the Prepetition Lender and the DIP Lender, there will be no assets from which to generate a dividend for unsecured creditors, except potential litigation claims. Second, the expenses of a chapter 7 trustee, and the fees and expenses of the trustee's legal counsel and accountants would add additional administrative expenses that would be paid ahead of General Unsecured Creditors. The learning curve for the trustee and his or her professionals would simply increase expense and reduce the recoveries to creditors.

Because the Plan implements the priorities set forth in the Bankruptcy Code, each creditor will receive under the Plan property of a value that is not less than the amount such creditor would receive in a chapter 7 case. The Plan presents a materially better alternative to creditors than a chapter 7 liquidation because the Plan provides greater recoveries for Holders of General Unsecured Claims.

49

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

The following discussion is not intended to be inclusive and should be read in connection with the other disclosures contained in this Disclosure Statement, the Plan and the exhibits attached hereto and to the Plan. You should carefully consider the risks described below in addition to the other information contained in this document. It is recommended that you consult your legal, financial and tax advisors regarding the risks association with the Plan and distributions you may receive thereunder.

The Plan is conditioned on the Debtors' fulfillment of their responsibilities under the Plan together with JIG's performance of its obligations, and the Bankruptcy Court's Confirmation of the Plan. Although the Debtors currently expect that all of the events required under the Plan will be consummated, there is always a risk that an unforeseen development could affect either the Confirmation or the implementation of the Plan or affect the transactions contemplated under the Plan after Confirmation. In addition, the Plan contains several conditions precedent to the Confirmation of the Plan and it is possible that one or more of these conditions may not be satisfied. Thus, the recovery by creditors may vary. Some of the risks to Confirmation and implementation of the Plan follow.

A.     **Allowed Claims May Exceed Good Faith Estimates**

There can be no assurance that the estimated Claim amounts assumed for the purpose of preparing the Plan are correct. The actual amount of Allowed Claims in any Class likely will differ in some respect from the estimates and could be materially greater than anticipated by the Plan Proponents, which, in turn, could impact the distributions to be made to Holders of Claims. However, if Holders of General Unsecured Claims accept Option 1, they receive a guaranteed distribution, irrespective of the amount of Allowed Claims in their respective Class. By contrast, if such Holders accept Option 2, they are subject to dilution risk. The estimated amounts are subject to certain risks, uncertainties and assumptions. Should one or more of the risks or uncertainties materialize, or should underlying assumptions prove incorrect, the actual amount of Allowed Claims may vary from those estimated for the purpose of preparing the Plan.

50

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

**B.     Plan May Not Be Confirmed**

There can be no assurance that the requisite acceptances to confirm the Plan will be received. Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan. A rejecting creditor or Holder of an Interest may challenge the balloting procedures and results as not being in compliance with the Bankruptcy Code or Bankruptcy Rules. While the Plan Proponents believe that the Plan satisfies all of the Confirmation requirements under section 1129 of the Bankruptcy Code, there is no guarantee that the Bankruptcy Court will concur with this analysis and necessarily confirm the Plan.

**C.     Recoveries Are Contingent on Certain Factors**

The estimated amount of Cash available for distribution to Holders of Claims is contingent upon various factors, including factors outside of the control of the Debtors. Accordingly, distributions on account of certain Claims may be less than anticipated.

**D.     Government Investigations**

As described above in section II.I., the company is subject to certain government agency review and investigations, the results of which have not yet concluded and the results of which are uncertain. These may negatively impact the operations or financial condition of the Reorganized Debtors after the Effective Date or could increase the Claims asserted against the Estates.

**VIII.**

**FEASIBILITY**

Section 1129(a)(11) of the Bankruptcy Code requires a finding that confirmation of a plan is not likely to be followed by the liquidation, or the need for further reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan. JIG will provide the Plan Funding Amount in order to fund payment obligations under the Plan. In addition, the Debtors' Post Confirmation Budget (attached hereto as **Exhibit "2"**) establishes that Reorganized Blue Earth will have adequate cash flow to fund its obligations under the Plan thereafter. Accordingly, the Plan proposed by the Debtors satisfies the requirements of section 1129(a)(11) and is "feasible."

51

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

## IX.

## CONFIRMATION OF THE PLAN

The Debtors will seek Confirmation of the Plan at the Confirmation Hearing, pursuant to applicable provisions of the Bankruptcy Code. If the Plan is not confirmed by the Bankruptcy Court and consummated, the alternatives include (a) liquidation of the Debtors under chapter 7 or chapter 11 of the Bankruptcy Code; or (ii) Confirmation of an alternative plan of reorganization under chapter 11 of the Bankruptcy Code. If the Plan is not confirmed, the Debtors will decide which alternative to pursue by weighing each of the available options and choosing the alternative or alternatives that are in the best interests of the Debtors, their creditors and other parties in interest. However, the Plan Proponents believe that the Plan, as proposed, provides the greatest possible return currently available for the Holders of Claims in these Chapter 11 Cases.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

Case: 16-30296    Doc# 131    Filed: 05/06/16    Entered: 05/06/16 18:02:57    Page 57 of 78

# VIII.

## RECOMMENDATION AND CONCLUSION

Based on the foregoing, the Plan Proponents believe that the Plan is in the best interests of creditors and urge creditors to vote to accept the Plan.

Dated:  May 6 , 2016     Respectfully submitted,

BLUE EARTH, INC.

By: _____
Name: G. Robert Powell
Title:

Dated:  May 6 , 2016     Respectfully submitted,

BLUE EARTH TECH, INC.

By: _____
Name: G. Robert Powell
Title:

Dated:  May __, 2016     Respectfully submitted,

JACKSON INVESTMENT GROUP, LLC

By: _____
Name:
Title:

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

# VIII.

## RECOMMENDATION AND CONCLUSION

Based on the foregoing, the Plan Proponents believe that the Plan is in the best interests of creditors and urge creditors to vote to accept the Plan.

Dated: May __, 2016       Respectfully submitted,

BLUE EARTH, INC.

By: _____
Name:
Title:

Dated: May __, 2016       Respectfully submitted,

BLUE EARTH TECH, INC.

By: _____
Name:
Title:

Dated: May 6, 2016       Respectfully submitted,

JACKSON INVESTMENT GROUP, LLC

By: _____
Name: RICHARD L. JACKSON
Title: CEO

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

**EXHIBIT "1"**

**Plan**

**[Filed Separately]**

DOCS_LA:298397.7

**EXHIBIT "2"**

**Post Confirmation Budget**

**FINANCIAL PROJECTIONS**

The Plan Proponents developed the following financial projections for the period of August 1, 2016 through December 31, 2016, and the years ending December 31 for each of 2017 and 2018 (such projections, the "Financial Projections" and, such period, the "Projection Period") for the purpose of demonstrating feasibility of the Plan. The Financial Projections present, to the best of the Plan Proponents' knowledge, the Reorganized Debtors' projected financial position, results of operations, and cash flows during the Projection Period. Unless otherwise defined, capitalized terms used herein shall have the meanings set forth in the Plan.

*Assumptions Used in the Financial Projections*

The Financial Projections are premised on a number of important assumptions. Although the Plan Proponents believe the assumptions to be reasonable based on currently available information, the Plan Proponents can provide no assurance that these assumptions will be realized.

**General Assumptions**

1. **Plan Terms and Consummation.** The Financial Projections assume the reorganization will be consummated as of the Effective Date, which for modeling purposes is assumed to occur as of July 24, 2016.
2. **Fresh Start Accounting.** In connection with the Plan, the Debtors will be required to restate their balance sheet in accordance with the principles of fresh start accounting. The Financial Projections have been prepared consistent with the basic principles of fresh start accounting as set forth in American Institute of Certified Public Accountants Statement of Position 90-7. The Plan Proponents are in the process of evaluating further how principles of fresh start accounting will be allocated to the Debtors' various assets. The final allocation may differ from the amounts presented herein.
3. **Summary** The Financial Projections are premised on the following key components:
   a. Issuance of the Exit Note to Jackson Investment Group based on the assumption of $8,000,000 of debt from a combination of the Plan Funding Amount, a substantial portion of the DIP Claim, and the balance from the Prepetition Note Secured Claim. As reflected in the Financial Statements, a portion of the Exit Note is reduced through the application of value received from Brooks in the amount of $2,400,000. In 2017, it is projected that the Exit Note is further reduced through the realization of $2,000,000 in proceeds from EnSite.
   b. The term of the Exit Note is 5 years with no principal or interest payments required until maturity. If necessary, the maturity date of the outstanding debt owing to Jackson Investment Group may be further extended or satisfied in full from the Reorganized Debtor's assets in kind.
   c. As described in the Plan, Brooks Heat and Power, Ltd. will be spun out to a new entity that will not be owned or operated by the Debtors.
   d. The Sumter facility will be the only remaining operating subsidiary of the Debtors on a post confirmation basis, with the exception of EnSite which is operated through independent management. The Financial Projections are consolidated with respect to the Sumter facility and its operations, while amounts related to EnSite, Solar and Other Assets are not consolidated but reflected at their net estimated recoverable value.
   e. Receivables will be collected in the ordinary course.

**Income Statement**

4. **Revenues** All revenues are from the Sumter facility. Revenues are projected based on current methane availability.
5. **Operating and Maintenance Costs** Operating and Maintenance costs are projected between fixed and variable. Fixed costs are projected at $150,000 per year with a 2% escalation. Variable costs are projected at $9 per MWh.
6. **Transmission** Transmission charges are based on an estimated annual cost of $21,000.
7. **Land Rent** Land rent is projected at $250 per month.

8. **Interest**  The post-emergence debt from Jackson Investment Group will accrue interest at the rate of 1% per annum.
9. **Corporate Lease, net**  Under the Plan, the Debtors' corporate lease will be assumed.  An affiliate of the post-emergence Debtors will utilize the premises and reimburse the Debtors for any lease and ancillary costs.

**Balance Sheet**
10. **Post-Reorganization Assets**  Asset values are estimated based on the "High" values in the Liquidation Analysis, and it is projected that EnSite will yield $2,000,000 in proceeds in 2017.
11. **Lien on Sumter**  The Sumter facility is subject to a claim by TCA Global Master Credit Fund in the approximate amount of $916,000 and the Sumter facility was recently appraised at $750,000.  The Debtor is in negotiations regarding the ultimate resolution and potential repayment terms of this obligation.  Those discussions are in process and have not been finalized.

*Disclaimers*

The Financial Projections were not prepared to comply with the guidelines for prospective financial statements published by the American Institute of Certified Public Accountants.  The Debtors' independent accountants have neither examined nor compiled the accompanying projections and accordingly do not express an opinion or any other form of assurance with respect to the Financial Projections, assume no responsibility for the Financial Projections, and disclaim any association with the Financial Projections.

The Debtors do not publish projections of their anticipated financial position or results of operations.  Unless otherwise required by securities law, the Debtors will not (a) furnish updated projections, or (b) make updated information concerning the Financial Projections publicly available.

The Plan Proponents believe that the Financial Projections represent the most probable range of operating results and financial position and that the estimates and assumptions underlying the projections are reasonable.  The estimates and assumptions may not be realized, however and are inherently subject to significant business, economic, and competitive uncertainties and contingencies, many of which are beyond the Plan Proponents' control.  No representations can be or are made as to whether the actual results will be within the range set forth in the Financial Projections.  Some assumptions inevitably may not materialize, and events and circumstances occurring subsequent to the date on which the Financial Projections were prepared may be different from those assumed or anticipated, and therefore may affect financial results in a material and possibly adverse manner.  The Financial Projections may not be relied upon as a guarantee or other assurance of the actual results that will occur.

Case: 16-30296    Doc# 131    Filed: 05/06/16    Entered: 05/06/16 18:02:57    Page 63 of 78

Blue Earth, Inc.
Projected Statements of Operations

| | 2016 | | | | | | Year Ended December 31, | |
| | August | September | October | November | December | Total | 2017 | 2018 |
|---|---|---|---|---|---|---|---|---|
| Revenues | $ 47,444 | $ 45,718 | $ 35,225 | $ 33,936 | $ 42,274 | $ 204,597 | $ 483,610 | $ 483,610 |
| | | | | | | | | |
| Operating Expenses | | | | | | | | |
| O&M Costs Fixed | 12,500 | 12,500 | 12,500 | 12,500 | 12,500 | 62,500 | 151,500 | 154,530 |
| O&M Costs Variable | 9,276 | 9,276 | 9,276 | 9,276 | 9,276 | 46,380 | 112,425 | 114,674 |
| Asset Management Cost | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 6,250 | 15,150 | 15,453 |
| Transmission Charges (Duke) | 1,750 | 1,750 | 1,750 | 1,750 | 1,750 | 8,750 | 21,210 | 21,634 |
| Insurance Cost | 2,406 | 2,406 | 2,406 | 2,406 | 2,406 | 12,029 | 28,870 | 28,870 |
| Property Tax | 172 | 172 | 172 | 172 | 172 | 858 | 2,007 | 1,904 |
| Land Rent | 250 | 250 | 250 | 250 | 250 | 1,250 | 3,000 | 3,000 |
| Total Expenses | 27,603 | 27,603 | 27,603 | 27,603 | 27,603 | 138,017 | 334,163 | 340,065 |
| | | | | | | | | |
| Operating Income Before Other Expenses (Income) | 19,841 | 18,114 | 7,622 | 6,333 | 14,670 | 66,580 | 149,448 | 143,545 |
| | | | | | | | | |
| Other Expenses (Income): | | | | | | | | |
| Depreciation | 12,500 | 12,500 | 12,500 | 12,500 | 12,500 | 62,500 | 150,000 | 150,000 |
| Corporate Lease, Net | - | - | - | - | - | - | - | - |
| Interest | 4,667 | 4,671 | 4,674 | 4,678 | 4,682 | 23,372 | 56,492 | 36,968 |
| EnSite | | | | | | | - | |
| Total Other Expenses (Income) | 17,167 | 17,171 | 17,174 | 17,178 | 17,182 | 85,872 | 206,492 | 186,968 |
| | | | | | | | | |
| Net Income (Loss) | $ 2,674 | $ 944 | $ (9,552) | $ (10,846) | $ (2,512) | $ (19,292) | $ (57,045) | $ (43,423) |

Case: 16-30296   Doc# 131   Filed: 05/06/16   Entered: 05/06/16 18:02:57   Page 64 of 78

Blue Earth, Inc.
Projected Balance Sheets

| | Confirmation | | 2016 | | | | | | December 31, | | |
| | | August | September | October | November | December | | 2017 | | 2018 |
|---|---|---|---|---|---|---|---|---|---|---|
| **Current Assets** | | | | | | | | | | |
| Cash | $ - | $ 27,041 | $ 52,355 | $ 67,177 | $ 80,710 | $ 102,580 | | $ 1,028,553 | $ | 1,615,035 |
| Receivables | - | - | - | - | - | - | | - | | - |
| Brooks | 2,400,000 | | | | | | | | | |
| Sumter | 750,000 | 737,500 | 725,000 | 712,500 | 700,000 | 687,500 | | 537,500 | | 387,500 |
| Solar | 1,300,000 | 1,300,000 | 1,300,000 | 1,300,000 | 1,300,000 | 1,300,000 | | 887,475 | | 444,538 |
| EnSite | 4,860,000 | 4,860,000 | 4,860,000 | 4,860,000 | 4,860,000 | 4,860,000 | | 2,860,000 | | 2,860,000 |
| Other Assets | 440,000 | 432,800 | 425,600 | 418,400 | 411,200 | 404,000 | | 40,000 | | 40,000 |
| | $ 9,750,000 | $ 7,357,341 | $ 7,362,955 | $ 7,358,077 | $ 7,351,910 | $ 7,354,080 | | $ 5,353,528 | $ | 5,347,073 |
| **Liabilities** | | | | | | | | | | |
| TCA - Sumter | $ 750,000 | $ 750,000 | $ 750,000 | $ 750,000 | $ 750,000 | $ 750,000 | | $ 750,000 | $ | 750,000 |
| Term Debt - Jackson Investment Group | $ 8,000,000 | $ 5,604,667 | $ 5,609,337 | $ 5,514,012 | $ 5,618,690 | $ 5,623,372 | | $ 3,679,864 | $ | 3,716,832 |
| Total Liabilities | 8,750,000 | 6,354,667 | 6,359,337 | 6,364,012 | 6,368,690 | 6,373,372 | | 4,429,864 | | 4,466,832 |
| **Stockholders Equity** | 1,000,000 | 1,002,674 | 1,003,618 | 994,066 | 983,220 | 980,708 | | 923,664 | | 880,241 |
| | $ 9,750,000 | $ 7,357,341 | $ 7,362,955 | $ 7,358,077 | $ 7,351,910 | $ 7,354,080 | # $ 5,353,528 | | $ | 5,347,073 |

4 of 5

Case: 16-30296    Doc# 131    Filed: 05/06/16    Entered: 05/06/16 18:02:57    Page 65 of 78

Blue Earth, Inc.
Projected Statements of Cash Flows

| | | 2016 | | | | | Year Ended December 31, | |
|---|---|---|---|---|---|---|---|---|
| | August | September | October | November | December | Total | 2017 | 2018 |
| **Cash Flows From Operations** | | | | | | | | |
| Net Income (Loss) | $ 2,674 | $ 944 | $ (9,552) | $ (10,846) | $ (2,512) | $ (19,292) | $ (57,045) | $ (43,423) |
| Adjustments to Reconcile Net Income (Loss) to | | | | | | | | |
| Cash Flows from Operations: | | | | | | | | |
| Accrued Interest | 4,667 | 4,671 | 4,674 | 4,678 | 4,682 | 23,372 | 56,492 | 36,968 |
| Depreciation | 12,500 | 12,500 | 12,500 | 12,500 | 12,500 | 62,500 | 150,000 | 150,000 |
| Cash Flows from Operations: | 19,841 | 18,114 | 7,622 | 6,333 | 14,670 | 66,580 | 149,448 | 143,545 |
| | | | | | | | | |
| **Cash Flows From Investing Activities** | | | | | | | | |
| Proceeds from EnSite | - | - | - | - | - | - | 2,000,000 | - |
| | | | | | | | | |
| **Cash Flows From Financing Activities** | | | | | | | | |
| TCA | TBD | TBD | TBD | TBD | TBD | TBD | TBD | TBD |
| Payment on Term Note | - | - | - | - | - | - | (2,000,000) | - |
| Collections on Notes Receivable | 7,200 | 7,200 | 7,200 | 7,200 | 7,200 | 36,000 | 776,525 | 442,937 |
| Cash Flows From Financing Activities | 7,200 | 7,200 | 7,200 | 7,200 | 7,200 | 36,000 | (1,223,475) | 442,937 |
| | | | | | | | | |
| Total Cash Flows | 27,041 | 25,314 | 14,822 | 13,533 | 21,870 | 102,580 | 925,973 | 586,482 |
| Beginning Cash | 0 | 27,041 | 52,355 | 67,177 | 80,710 | - | 102,580 | 1,028,553 |
| | | | | | | | | |
| Ending Cash | $ 27,041 | $ 52,355 | $ 67,177 | $ 80,710 | $ 102,580 | $ 102,580 | $ 1,028,553 | $ 1,615,035 |

Case: 16-30296   Doc# 131   Filed: 05/06/16   Entered: 05/06/16 18:02:57   Page 66 of 78

**EXHIBIT "3"**

**Liquidation Analysis**

DOCS_LA:298397.7

Blue Earth, Inc.
Estimated Chapter 7 Liquidation Analysis

A. Introduction

Under the "best interests" of creditors test set forth in section 1129(a)(7) of the Bankruptcy Code, the Bankruptcy Court may not confirm a plan of reorganization unless the plan provides each holder of a claim or interest who does not otherwise vote in favor of the plan with property of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the debtor was liquidated under chapter 7 of the Bankruptcy Code. To demonstrate that the Plan satisfies the "best interests" of creditors test, the Plan Proponents have prepared the following hypothetical Liquidation Analysis, which is based upon certain assumptions as discussed in the notes accompanying the Liquidation Analysis (the "Notes"). Unless otherwise defined, capitalized terms used herein shall have the meanings set forth in the Plan.

The Liquidation Analysis estimates potential cash distributions to holders of allowed claims in a hypothetical Chapter 7 liquidation of the Debtors' assets. Asset values discussed in the Liquidation Analysis may differ materially from values referenced in the Plan and Disclosure Statement.

B. Scope and Purpose of the Liquidation Analysis

The determination of the costs of, and hypothetical proceeds, from the liquidation of the Debtor' assets is an uncertain process involving the extensive use of estimates and assumptions that, although considered reasonable by the Plan Proponents, are inherently subject to significant business, economic, and competitive uncertainties and contingencies beyond the control of the Debtors and their management and advisors. Inevitably, some assumptions in the Liquidation Analysis may not materialize and there could be unanticipated or unforeseen events and circumstances that could materially impact the ultimate results of a liquidation. The Liquidation Analysis was prepared for the sole purpose of generating a reasonable good-faith estimate of the proceeds that might be generated if the Debtors liquidated in accordance with Chapter 7 of the Bankruptcy Code. The Liquidation Analysis is not intended and should not be used for any other purpose. The underlying financial information in the Liquidation Analysis was not compiled or examined by independent accountants. In certain cases, independent appraisals were conducted in preparing the Liquidation Analysis. Neither the Plan Proponents nor their advisors make any representation or warranty that the actual results would or would not approximate the estimated amounts and assumptions represented in the Liquidation Analysis. Actual results could vary materially. THE PLAN PROPONENTS MAKE NO REPRESENTATION OR WARRANTIES REGARDING THE ACCURACY OF THE ESTIMATES AND THE ASSUMPTIONS OR A TRUSTEE'S ABILITY TO ACHIEVE FORECASTED RESULTS. IN THE EVENT THE CHAPTER 11 CASES ARE CONVERTED TO CHAPTER 7, ACTUAL RESULTS MAY VARY MATERIALLY FROM THE ESTIMATES AND PROJECTIONS SET FORTH IN THE LIQUIDATION ANALYSIS.

In preparing the Liquidation Analysis, the Plan Proponents estimated Allowed Claims based upon a review of Claims listed on the Debtor's Schedules and Proofs of Claim filed to date. In addition, the Liquidation Analysis includes estimates for Claims not currently asserted in the Chapter 11 Cases, but which could be asserted and allowed in a chapter 7 liquidation, including Administrative Claims, wind-

Case: 16-30296   Doc# 131   Filed: 05/06/16   Entered: 05/06/16 18:02:57   Page 68 of 78

down costs, trustee fees, tax liabilities, and certain lease and contract rejection damages. To date, the Bankruptcy Court has not estimated or otherwise fixed the total amount of Allowed Claims used for purposes of preparing the Liquidation Analysis.

NOTHING CONTAINED IN THE LIQUIDATION ANALYSIS IS INTENDED OR CONSTITUTES A CONCESSION OR ADMISSION OF THE PLAN PROPONENTS. THE ACTUAL AMOUNT OF ALLOWED CLAIMS IN THE CHAPTER 11 CASES COULD DIFFER MATERIALLY FROM THE ESTIMATED AMOUNTS SET FORTH IN THE LIQUIDATION ANALYSIS. THE LIQUIDATION ANALYSIS IS NOT AN ADMISSION AS TO THE VALIDITY, EXTENT, OR PRIORITY OF ANY CLAIM OR LIEN.

## Blue Earth, Inc. Liquidation Analysis

| Note | | Estimated Book Value at Confirmation | Estimated Liquidation Value High | Estimated Liquidation Value Low |
|---|---|---|---|---|
| | **Assets** | | | |
| 1 | Cash | $ - | $ - | $ - |
| 2 | Intercompany Receivables | 5,276,921 | - | |
| 3 | Notes Receivable - | 114,349 | 114,349 | 114,349 |
| 4 | Deposits | 16,838 | - | - |
| 5 | Fixed Assets, net | 54,747 | 30,000 | 15,000 |
| 6 | Due From Blue Earth, CHP, Inc. | 25,297,259 | | |
| | Brooks | | 2,400,000 | 1,600,000 |
| | Sumter | | 750,000 | 750,000 |
| 7 | Ensite Power, Inc. | 1,260,676 | 4,860,000 | 4,860,000 |
| 8 | Blue Earth Solar, Inc. | 11,683,687 | 1,300,000 | 1,300,000 |
| 9 | Blue Earth Generator, Inc. | 247,758 | 280,000 | 200,000 |
| 10 | Causes of Action | - | | |
| 11 | Net Operating Loss | - | - | - |
| | **Total Funds Available for Distribution** | | 9,734,349 | 8,839,349 |
| | | | | |
| | **Secured Claims:** | | | |
| 12 | Jackson Investment Group | 23,282,326 | 23,282,326 | 23,282,326 |
| 12 | Chapter 11 DIP Loan | 3,000,000 | 3,000,000 | 3,000,000 |
| 14 | TCA | 916,379 | 916,379 | 916,379 |
| | **Total Secured Claims** | 27,198,705 | 27,198,705 | 27,198,705 |
| | Funds Available for Secured Claims | | (9,734,349) | (8,839,349) |
| | Deficiency Claims | | 17,464,356 | 18,359,356 |
| | | | | |
| | **Deficiency Claim by Creditor** | | | |
| | Jackson Investment Group | | 17,297,977 | 18,192,977 |
| | TCA | | 166,379 | 166,379 |
| | Total Deficiency Claims | | 17,464,356 | 18,359,356 |
| | | | | |
| | **Chapter 7 and Chapter 11 Administrative Claims:** | | | |
| 15 | Chapter 7 Trustee and Other Expenses | | 500,000 | 250,000 |
| 16 | Chapter 11 Accrued and Unpaid Administrative Claims | 1,490,628 | 1,500,000 | 1,300,000 |
| 17 | Chapter 11 Unpaid Priority Claims | 163,690 | 163,690 | 163,690 |
| | **Chapter 7 and Chapter 11 Administrative Claims** | | 2,163,690 | 1,713,690 |
| | | | | |
| | **Administrative and Deficiency** | | | |
| | Deficiency Claims | | 17,464,356 | 18,359,356 |
| | Chapter 7 and Chapter 11 Administrative Claims | | 2,163,690 | 1,713,690 |
| | **Total Administrative and Deficiency** | | 19,628,046 | 20,073,046 |
| | | | | |
| | **Unsecured Claims:** | | | |
| | Unsecured Claims - Scheduled | 3,044,457 | 3,044,457 | 3,044,457 |
| 13 | Laird Q. Cagan | 1,722,736 | 1,722,736 | 1,722,736 |
| | Deficiency Claims | - | 17,464,356 | 18,359,356 |
| 4 | Lease Rejection Damage Claim | - | 151,362 | 151,362 |
| 10 | **Total Unsecured Claims** | | 22,382,911 | 23,277,911 |

Case: 16-30296    Doc# 131    Filed: 05/06/16    Entered: 05/06/16 18:02:57    Page 70 of 78

See Accompanying Notes to Liquidation Analysis

## Notes to Liquidation Analysis

**Overview**

The Liquidation Analysis assumes conversion of the Debtors' Chapter 11 cases to Chapter 7 liquidation cases as of July 19, 2016 (the "Conversion Date"). On the Conversion Date, it is assumed that the Bankruptcy Court would appoint one Chapter 7 trustee (the "Trustee") to oversee the liquidation of the estates. The Liquidation Analysis assumes a liquidation of substantially all of the Debtors' assets. The Liquidation Analysis assumes that the Trustee may engage professionals and seek to monetize the Debtors' assets in an orderly fashion. However, as the Debtors have neither funds, nor a source of funding with which the Trustee may operate, the Trustee may choose to minimize the administrative claims of the estates and allow secured creditors to take possession of their collateral in an expedited manner.

ULTIMATELY, ABSENT MATERIAL RECOVERIES ON CAUSES OF ACTION, THE LIQUIDATION ANALYSIS REFLECTS THAT (A) THERE WILL BE INSUFFICIENT FUNDS, AFTER PARTIAL PAYMENT OF SECURED CLAIMS, TO SATISFY ADMINISTRATIVE EXPENSES, AND (B) UNSECURED CREDITORS WOULD RECEIVE A RECOVERY OF 0% ON ACCOUNT OF THEIR CLAIMS, WHICH WOULD INCLUDE SUBSTANTIAL DEFICIENCY CLAIMS.

**Note 1  Cash**    The Debtors have no cash. Costs incurred during the pendency of the Chapter 11 cases have been paid pursuant to a Debtor in Possession loan in the amount of $3,000,000 approved by the Court on April 29, 2016. It is assumed that all availability under such loan has been fully utilized as of the Conversion Date.

**Note 2 Intercompany Receivables.**  Blue Earth, Inc. is the holding company for certain wholly-owned subsidiaries and also holds a 72% interest in Ensite Power, Inc. Prior to the Filing Date, Blue Earth, Inc. provided funding to its various subsidiaries and recorded a corresponding receivable from such subsidiaries. Concurrently, each subsidiary would record an obligation to Blue Earth, Inc. upon receipt of such funds. Based on the Debtors' analysis of the subsidiaries' assets, obligations and operations, the Debtors have concluded that the likelihood of recovering funds pursuant to these related party receivables is remote for substantially all related party accounts except those pertaining to Blue Earth, CHP, Inc. (see Note 6), Blue Earth Solar, Inc. (See Note 8), and Blue Earth Generator, Inc. (see Note 9). Nonetheless, a summary of the related party receivables for all subsidiaries is provided below:

Case: 16-30296   Doc# 131   Filed: 05/06/16   Entered: 05/06/16 18:02:57   Page 71 of 78

| Due From | Amount Due |
|---|---|
| Blue Earth Energy Managements Services, Inc. | $ 549,363 |
| Blue Earth Capital, Inc. | 622,513 |
| E2B Growth, Inc. | 2,737,354 |
| Blue Earth Finance, inc. | 1,367,691 |
| Subtotal | 5,276,921 |
| Blue Earth Generator, Inc. | 247,758 |
| Ensite Power, Inc. | 1,260,676 |
| Blue Earth CHP, Inc. | 25,297,259 |
| Blue Earth Solar, Inc. | 11,683,687 |
| Total Per Schedules | $ 43,766,301 |

**Note 3 Notes Receivable**  The Debtors have two notes receivable.  The first note has a balance of approximately $65,600 and is paid in quarterly installments of approximately $22,000.  The second note has a balance of approximately $48,750 and is paid in monthly installments of approximately $1,700. The Debtors believe these amounts are fully collectable.  In the accompanying analysis, the amounts are included at their face (undiscounted) amount.

**Note 4 Deposits**  The landlord of the Debtors' corporate office holds a deposit in the amount of $16,638. There are approximately 50 months remaining on the lease and the rent is approximately $14,000 per month. Under a liquidation scenario, the Trustee would reject the lease and the landlord would be entitled to damages in the amount of one year's rent, less the amount of the deposit.  Accordingly, the landlord's damage claim would be approximately $151,362 ($14,000 x 12, less $16,638).

**Note 5 Fixed Assets**  Fixed assets consist primarily of office furniture and fixtures.  Net recovery amounts under an orderly liquidation are estimated to be between $30,000 and $15,000.

**Note 6 Due from Blue Earth CHP, Inc.**  Amounts due from Blue Earth, CHP, Inc. ("CHP") are $25,297,259.  Under a liquidation scenario, certain assets of various subsidiaries of CHP are projected to result in partial payments on the intercompany receivable to Blue Earth, Inc.  A summary of those amounts is as follows:

**Brooks**  In August 2014, Brooks Heat & Power, Ltd. (a wholly-owned subsidiary of CHP), entered into a 10-year energy purchase agreement ("EPA") and concomitant  land lease with a customer (collectively. the "Brooks Agreement").  The Brooks Agreement provided for the construction of a cogeneration energy facility in Brooks, Alberta, Canada in which Blue Earth, through its affiliates, would design, build, finance, own and operate the energy facility.  As of the Filing Date, construction had ceased due to the Debtors' and their affiliates' inability to obtain funding and continue construction of the project.  Estimated costs to complete are approximately $10 million and there is an additional approximate $1.6 million lien filed against the land by a contractor called DCO.  The Brooks Agreement terminates by its own terms should the project not be completed by August 2016.

In the first quarter of 2016, the Debtors engaged a third party valuation group (the "Valuation Professionals") to assess the value of the Brooks project.  The Valuation Professionals concluded that (a) assuming the Brooks Agreement could be extended or renegotiated to allow time to

Case: 16-30296   Doc# 131   Filed: 05/06/16   Entered: 05/06/16 18:02:57   Page 72 of 78

complete the project and (b) an additional $10 million of financing could be obtained to allow funding to complete the project, then under a discounted cash flow approach, the Brooks project would have a fair market value of approximately $8 million as of April 2016. However, the Valuation Professionals believe that the discounted cash flow approach is unwarranted given the lack of funding to complete the project and the fact that the present contract terms make timely completion impossible. Accordingly, the Valuation Professionals concluded that the most reasonable method for estimating fair market value of the Brooks project is under a liquidation scenario pursuant to which the Valuation Professionals estimated a recovery of approximately $4.0 million to $3.2 million. The Liquidation Analysis projects that, from these proceeds, the Trustee would pay the $1.6 claim of DCO, resulting in net recovered funds ranging between approximately $2.4 and $1.6.

**Sumter** In 2015, Sumter Heat and Power, LLC ("Sumter"), a wholly-owned subsidiary of CHP, commenced operations of a 1.39 MW facility in Sumter, South Carolina. This facility operates under a 10-year contract with a third party that was signed in December 2014. In connection with this facility, Sumter entered into a 10-year contract with another party for the sale of renewable energy credits generated at this facility. Since commencing operations, the Sumter facility has been operating at about 29% of original projected capacity. In the first quarter of 2016, the Debtor engaged the Valuation Professionals to assess the value of Sumter. Utilizing a discounted cash flow approach, the Valuation Professionals estimated the fair market value of Sumter to be approximately $750,000. For purposes of the Liquidation Analysis, the Debtors have utilized this assessment of value.

**Other** CHP has certain deposits with manufacturers of turbines. Although these deposits are not subject to refund, there may exist some opportunity for a Trustee to attempt to monetize these deposits. For purposes of the Liquidation Analysis, any potential recoveries were deemed speculative and not included herein.

**Note 7 Investment in EnSite** EnSite Power, Inc. ("EnSite") is a majority-owned subsidiary of Blue Earth, Inc. EnSite seeks to provide a Nickel-Zinc ("NiZn") battery alternative to historical lead-acid products as well as other advanced rechargeable chemistries. EnSite owns two technology business units – Blue Earth Energy Power Solutions and Blue Earth Power Performance Solutions – including certain patents and trademarks associated with these units. Preliminary revenues for 2015 are less than $2 million, while preliminary losses for 2015 are in excess of $2 million. During the fourth quarter of 2015 and first quarter of 2016, Ensite raised additional funds from non-Debtor affiliates to cover ongoing losses.

As of April 2016, EnSite's management was involved in a capital raising effort in order to purchase all or a portion of Blue Earth, Inc.'s interests in EnSite. EnSite is also seeking to complete a private placement for up to $15 million of preferred equity.

In the first quarter of 2016, Blue Earth, Inc. engaged a third party valuation group to assess the value of its 72% equity interest in EnSite. The third party appraiser noted that "As of the valuation date [April 4, 2016], EnSite's operational viability is unknown." Accordingly, the appraiser relied upon a market-based valuation approach tied to the recent issuance of convertible notes by EnSite and estimated the value of Blue Earth, Inc.'s 72% interest in EnSite at approximately $4.86 million. The Liquidation Analysis utilizes such third party assessment of value.

Case: 16-30296   Doc# 131   Filed: 05/06/16   Entered: 05/06/16 18:02:57   Page 73 of 78

**Note 8  Solar**  Blue Earth, Inc.'s wholly-owned subsidiary, Blue Earth Solar, Inc., has receivables of approximately $1.3 million that can serve as a source of funds to the Debtors.  These receivables are deemed to be fully collectable.

**Note 9 Blue Earth Generator, Inc.**  Blue Earth, Inc. is in the process of winding down the operations of Blue Earth Generator, Inc. and projects recovering approximately $280,000 to $200,000 from the collection of outstanding receivables.

**Note 10 Causes of Action**  The Debtors may have certain causes of action that would not be subject to the claims of secured creditors.  At the present time, the value of such causes of action is undetermined.  Unsecured claims pursuant to a liquidation scenario are estimated to be between $19.5 million and $18.6 million.  The Debtors believe that the only recovery available to unsecured claims in a liquidation would be from the proceeds of potential estate causes of actions.  Although the Debtors have not estimated the amount recoverable from such causes of action, the Debtors believe that such recoveries could be increased in the context of a Chapter 11 case given access to knowledgeable persons and information that may not be available to a Trustee in a Chapter 7 case.

**Note 11 Net Operating Losses**  The Debtors have generated tax net operating losses ("NOLs") totaling approximately $42 million as of December 31, 2015.  Under a liquidation scenario, the Debtors do not project generating income against which these losses can be utilized.  Hence, the NOLs have been assessed $0 value under the Liquidation Analysis.

**Note 12 Jackson Investment Group**  Projected Balance includes amounts due under the DIP Facility ($3,000,000) and amounts due as of the Filing Date ($23,282,386).

**Note 13 Laird Q. Cagan**  For purposes of the Liquidation Analysis, it is assumed that the claim of Laird Q. Cagan is unsecured in the amount of $1,722,736.  Mr. Cagan, however, asserts a Secured Claim against the Debtors.  The Plan Proponents continue to investigate Mr. Cagan's asserted claims and reserve all rights to challenge the validity, priority, and amount of such claims on any grounds, including, but not limited to whether Mr. Cagan is the Holder of a Secured Claim.

**Note 14 TCA**  Amount due TCA Global Credit Master Fund, LP as of the Filing Date, which is purportedly secured by the Sumter facility.

**Note 15 Chapter 7 Trustee and Other Expenses**  The Liquidation Analysis assumes the conversion of the case to a Chapter 7 and estimates a Trustee and other professional expenses of between $500,000 and $250,000.

**Note 16 Chapter 11 Accrued and Unpaid Administrative Expenses**  The Liquidation Analysis assumes that accrued Chapter 11 administrative expenses in excess of amounts funded under the DIP Facility, will total between approximately $1,500,000 and $1,300,000 as of the Conversion Date.

**Note 17 Chapter 11 Unpaid Priority Claims**  Total priority claims as of the Filing Date.

Case: 16-30296   Doc# 131   Filed: 05/06/16   Entered: 05/06/16 18:02:57   Page 74 of 78

**EXHIBIT "4"**

**Corporate Organizational Chart**

DOCS_LA:298397.7

# Entity Org Chart





PROPRIETARY & CONFIDENTIAL

Case: 16-30296    Doc# 131    Filed: 05/06/16    Entered: 05/06/16 18:02:57    Page 76 of 78





PROPRIETARY & CONFIDENTIAL

2

02/22/2016



PROPRIETARY & CONFIDENTIAL



Case: 16-30296    Doc# 131    Filed: 05/06/16    Entered: 05/06/16 18:02:57    Page 78 of 78